UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES MAXWELL and JOSEPH PATITO, <br><br> Plaintiffs, <br><br> v. <br><br> PRIME DATA CENTERS, LLC, DATA REALTY HOLDINGS CORP., NICHOLAS LAAG and ULRICH PELZ, <br><br> Defendants. | ECF CASE <br><br> No.: _____ <br><br><br> COMPLAINT <br><br> JURY TRIAL DEMANDED |

Plaintiffs James Maxwell and Joseph Patito, by and through their attorneys, Lipsky Lowe LLP, allege as follows against Defendants Prime Data Centers, LLC ("Prime"), Data Realty Holdings Corp. ("DRH"), Nicholas Laag, and Ulrich Pelz:

PRELIMINARY STATEMENT

The compensation owed to Plaintiffs Maxwell and Patito under their Employment Agreements ("EAs") with Defendant Prime is directly correlated to the company's value. As Defendant Prime's value grew rapidly — greater than 4,000% from $140 Million to now over $6 Billion – the compensation owed to Plaintiffs Maxwell and Patito grew in lockstep, now exceeding $250 Million. Because honoring those contractual obligations was prohibitively expensive and would potentially cost them control over Prime, Defendants Laag and Pelz decided not to honor the terms of the EAs.

In furtherance of this scheme, Defendants Laag and Pelz made repeated material misrepresentations to Plaintiffs and other employees about these EAs, telling them the EAs are worthless, with the goal of trying to induce them to agree to new agreements. Defendants Laag and Pelz, at the same time, were representing to others the EAs have substantial value for recruitment and retention purposes and selling equity at escalating valuations for their own benefit.

Separate from their scheme to strip employees of their contractually owed compensation, Defendants made numerous misrepresentations to their capital partners (Macquarie Capital ("Macquarie"), Siemens Financial Services, Inc. ("Siemens"), Snowhawk LP ("Snowhawk"), Ares Management, LLC ("Ares"), Nuveen, LLC ("Nuveen"), One Investment Management Ltd ("OneIM") and Grain Management, LLC ("Grain")) and external auditor (Clifton Larson Allen, LLP ("CLA")) regarding the value of Plaintiffs' and other employees' EAs. They did so to attract these capital partners, maintain control over Prime, and increase profits to their entities.

Plaintiffs assert the following claims: breach of contract, promissory estoppel, unjust enrichment, *quantum meruit*, breach of the covenant of good faith and fair dealing, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, fraudulent transfer of assets in violation of New York Debtor and Creditor Law ("DCL") § 273(a)(1), and a declaratory judgment of Defendant DRH's alter ego status.

## THE PARTIES

1.      Plaintiff Joseph Patito is an individual residing in the State of New York.

2.      Plaintiff James Maxwell is an individual residing in the State of Illinois.

3.      Defendant Prime Data Centers, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its nominal principal place of business in Dallas, Texas.

4.      Defendant Data Realty Holdings Corp. is a Delaware corporation, with its principal place of business at 3140 Peacekeeper Way, Suite 101A, McClellan, California 95652.

5.      Defendant Nicholas Laag is an individual who, at all relevant times, served as the Chief Executive Officer of Defendant Prime and, directly or indirectly through a chain of holding entities — including Aperture Holdings S.à r.l. ("Aperture"), Data Realty Group, LLC ("DRG"),

Data Realty Holdings Corp. ("DRH"), Data Trust Holding S.a.r.l. ("DTH"), and Data Trust FinCo SA ("DTF") — held a majority equity interest in, and exercised control over, Defendant Prime. Defendant Laag is the ultimate indirect majority owner of each of the foregoing entities. Defendant Laag resides in New York, New York.

6.    Defendant Ulrich Pelz is an individual who, at all relevant times, served as the Chief Financial Officer of Defendant Prime. Defendant Pelz additionally serves in some capacity or exercises financial control over Aperture, DTH, DTF, DRH and DRG. Defendant Pelz primarily divides his time between Germany, Denmark and New York.

<u>JURISDICTION AND VENUE</u>

7.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*.

8.    This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because those claims are so related to Plaintiffs' federal claims that they form part of the same case or controversy.

9.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965 because a substantial part of the events or omissions giving rise to the claims occurred in this District, including that Defendants Laag and Pelz operated primarily out of Defendant Prime's New York office, Plaintiffs most frequently performed their duties in New York, key investor communications and wire transmissions underlying the RICO claims were sent from or received in this District, and Defendants regularly transacted business in this District. Defendants are subject to personal jurisdiction in this District because they purposefully directed their activities toward New York and the claims arise out of or relate to those contacts.

FACTUAL ALLEGATIONS

A.    Background

10.    Defendant Prime is an international data center developer and operator.

11.    Defendants' institutional capital partners include Macquarie, Ares, Siemens, Nuveen, Grain, OneIM and Snowhawk.

12.    Defendant Prime employed Plaintiff Patito from February 7, 2022 until February 2, 2026, when he was constructively discharged.

13.    Defendant Prime employed Plaintiff Maxwell from February 22, 2022 until February 2, 2026, when he was constructively discharged.

14.    Plaintiffs Patito and Maxwell were among Defendant Prime's early employees, each joining as core members of the team that built the company from a small operator into a multi-billion-dollar data center platform. Over their tenures, they worked directly with Defendants Laag and Pelz to execute approximately 25 transactions worth billions of dollars and to build the corporate infrastructure that laid the groundwork for Defendant Prime's equity value growing from $140 Million to over $6 Billion.

15.    Defendant Prime's official headquarters is in Texas, with Defendants Pelz and Laag primarily operating out of Defendant Prime's New York, New York office.

16.    Plaintiffs Patito and Maxwell most frequently performed their duties in New York, New York, with Plaintiff Maxwell never going to California for work purposes.

17.    On February 2, 2026, Plaintiffs were constructively discharged when Defendants continued to refuse to honor their EAs, retaliated against them for protected activity, made disciplinary threats against them for discussing compensation, conditioned salary increases on waiver of contractual rights, excluded them from the compensation processes while simultaneously trying to strip them of their contractual entitlements, created conditions so

intolerable that no reasonable employee in Plaintiffs' position would have remained. Prior to their constructive discharge, Plaintiffs repeatedly objected to Defendants' conduct, requested compliance with the EAs, and sought resolution through internal channels, including notifying Defendants Laag and Pelz, other members of management, and Board members, and requesting for independent review — all of which were rebuffed or ignored.

B.      Plaintiffs' Employment Agreements and Compensation Terms

18.      Defendant Prime entered binding EAs with Plaintiff Patito, effective February 7, 2022, and Plaintiff Maxwell, effective February 22, 2022, which are attached hereto.

19.      Each EA is an integrated agreement. Articles 10.12 (Entire Agreement) and 10.2 (Amendment & Waiver) provide that the EAs are the complete and exclusive understanding of the parties, bind successors and assigns, and may be amended or waived only by a written instrument signed by both parties.

20.      Article 5.2 (Company Representations) of each EA confirms that they constitute lawful, valid, and enforceable obligations of Defendant Prime, fully authorized through all required organizational and corporate actions, including Board approval.

21.      A pending action exists in the Superior Court of California, County of Sacramento, *Jeff Barber v. Nicholas Laag, Data Realty Holdings Corp. and Prime Data Centers*, Case No. 24-cv-16778, involving claims similar to what Plaintiffs are asserting here. There, Defendant Prime has taken the position that its employees' EAs are binding and integrated.

22.      Plaintiffs' EAs are consistent with the EAs that other employees signed who commenced working for Defendants around the same time Plaintiffs did, in that they included non-discretionary bonuses and phantom equity.

    i.       Non-Discretionary Performance Fee and Employee Co-Invest Rights (Exhibit B of the EAs)

23.      Exhibit B sets forth a multi-component compensation structure: (A) a base salary; and (B) Performance-Based Compensation, comprising of (i) a Discretionary Bonus and (ii) a Non-Discretionary Bonus.

24.      The "Non-Discretionary Bonus" provides for a percentage of "the carried interest (performance fee) on all deals Company closes as well as (2225 Martin that we closed in December 2021)" (the "Non-Discretionary Performance Fee"). The term "all deals Company closes" is broad, unconditional and unqualified. The EAs contain no limitation based on transaction form, investment vehicle, or source of funds.

25.      The EAs grant Plaintiffs Maxwell and Patito non-discretionary co-investment rights equal to a percentage of Defendant Prime's co-investment on all deals ("Employee Co-Invest Rights").[1] These rights apply to "all deals Company closes," without limitation based on transaction form or investment vehicle.

26.      The Non-Discretionary Performance Fees and Co-Invest Rights are part of Plaintiffs' overall compensation package.

    ii.      The Incentive Plan (Exhibit C of the EAs)

27.      Article 3.3 of each EA provides that the employee "shall be eligible to participate in the Incentive Plan attached hereto as Exhibit C, and shall be subject to all of the terms and conditions set forth therein immediately upon execution." This participation is unconditional and became effective upon each Plaintiff's execution of their respective EA.

---

[1] Despite their EAs providing for the Employee Co-Invest Rights, Plaintiffs never actually exercised that right because of Defendants' failure to perform under the EAs. Furthermore, Plaintiffs never contributed any money or other consideration to do so.

28.     Exhibit C's Incentive Plan sets forth an "Ownership Incentive Program" through phantom shares providing for: (i) a fixed upfront grant expressed as a percentage of Defendant Prime's units at execution of the EA; and (ii) milestone options expressed as a percentage of Defendant Prime's units at time of grant and tied to the achievement of the cumulative Net Asset Value ("NAV") of Defendant Prime.[2]

29.     Exhibit C's Incentive Plan contains an expressly defined NAV calculation methodology stating that "The pro-rata NAV for the Milestone Options are based on Companies' consolidated pro-forma value of assets that it controls through majority ownership or minority ownership based on equity method. The yearly NAV number shall include and accumulate on a pro-rata basis all retained earnings and capital gains from sales of assets and or shares in all Defendant Prime related entities as if no dividends or distributions have been paid out from normal course of business."

30.     By using this NAV methodology, Defendant Prime tied the value of employees' Incentive Plan to the company's market value: as the company's value increased, the Incentive Plan's value correspondingly increased.

31.     Article 3.3 of each EA vests the right to participate "immediately upon execution," in reference to the EA.

32.     Plaintiffs agreed to this compensation structure because they wanted their compensation aligned with the growth of the business.

33.     The Incentive Plan (i.e., the phantom equity) is part of Plaintiffs' deferred compensation package as employees of Defendants, which they were not required to purchase.

---

[2] Phantom equity is not true equity. It is, rather, a cash settlement equivalent of the per share value of Defendant Prime's equity. It does not represent ownership in the company and does not require any contribution to acquire.

C.      Defendant Prime's Systematic Efforts to Nullify, Re-trade and Eliminate Plaintiffs' and Other Employees' Compensation Rights

34.     Defendants repeatedly attempted to nullify, re-trade and eliminate Plaintiffs' and other employees' EAs.

i.      Why They Did This

35.     As Defendant Laag confessed to Plaintiffs in an email, Defendant Prime's "value had grown faster" than anticipated.

36.     With Defendant Prime's unanticipated, explosive valuation growth and the EAs' value tied to Defendant Prime's value, paying out the EAs had become prohibitively expensive from a cash payout perspective and in terms of diluting Defendant Laag's ownership of the company.

ii.     How They Did This

37.     Recognizing the ever-increasing value of the EAs, Defendants Laag and Pelz constructed the new compensation scheme to (i) circumvent paying material compensation obligations under the EAs owed to employees, including Plaintiffs and (ii) reduce dilution, in Defendant Laag's words, "[taking] the full interest of shareholders and not management (i.e. myself, c-suite and the team)."

38.     On or about April 1, 2023, Defendants Laag and Pelz circulated to Sam Southall of Macquarie a phantom share program (referred to here as "PSP1"), without disclosing to Southall that: (i) binding EAs already existed with materially different terms, and (ii) implementing PSP1 would require written amendments signed by each affected employee.

39.     PSP1 introduced material changes to Plaintiffs' and other employees' EAs, which particularly targeted the Incentive Plan in Exhibit C:

- An eight-year program term (the EAs had no fixed term for milestone options), which removed accelerated vesting by inserting years
- Substantially higher NAV-per-unit milestone thresholds, making it harder for employees to earn units (for Maxwell and Patito, the first NAV hurdle increased from $300 million to $600 million – Prime would have to grow by 400% versus the original 200%)
- Strike prices — not present in the EAs
- New subjective performance gates controlled by management, replacing the objective metrics in the EAs
- Removal of individual employee synthetic ownership percentages
- Forfeiture provisions for termination or non-compete violations, despite numerous EAs not having non-competes
- Payout deferred over four quarters
- Redefined a valuation methodology that derived a negative value of Defendant Prime while simultaneously transacting with Macquarie at a value of approximately $400 Million and Ares / Siemens at $856 Million
- Pushed the vesting start date out by a year by including a year of service concept

40.    Defendant Pelz's PSP1 draft and April 1st communication were the predicate to a multi-year campaign to fraudulently induce employees to forfeit their equity by misrepresenting and re-engineering the terms of their compensation packages.

D.    Defendants Target Various Employees In Their Fraudulent Scheme

41.    Defendants Laag and Pelz fraudulently induced all employees who have phantom equity (approximately 50) to provide services for phantom equity that Defendants have stated is worth zero under PSP1 and PSP2, including those detailed below, who signed new EAs.

42.    Defendants Laag and Pelz were the only individuals who were administering PSP1 and PSP2, which is particularly unusual for a CEO and CFO to do.

43.    Except for very few, including the Plaintiffs, Prime employees did not have a way to independently check the value of their equity in Defendant Prime, depriving them of material information.

i.  Senior Sales Executive Jeff Barber

44. As set forth in his Superior Court of California lawsuit, Defendants misrepresented to former Senior Sales Executive Jeff Barber the nature of his EA and fraudulently induced him to sign a different agreement.

45. Defendants Laag and Pelz implored, via emails, Barber to sign a new EA in anticipation of Macquarie's initial investment in Defendant Prime, while promising Barber that his equity was "protected," when it was not.

46. Defendants' fraudulent conduct towards Barber was the first of a larger pattern of dozens of predicate acts in their scheme to defraud employees.

ii.  Former Vice President and Head of Human Resources Natalie Funcheon

47. Funcheon, reporting directly to Defendant Laag, led Defendant Prime's global people strategy and all core HR functions.

48. In or around March 2023, Defendant Laag targeted Funcheon by requesting her EA under the guise of a compensation review, falsely claiming there were discrepancies in her original EA that needed to be corrected, thereby fraudulently inducing her to sign a revised agreement that materially reduced her equity by greater than approximately 70%.

49. Defendant Laag induced Funcheon to sign the revised agreement, taking advantage of her lack of understanding of the severity of the economic reduction it imposed.

50. Defendant Laag's assertion that Funcheon's EA had any discrepancies was materially false, misleading, and communicated with the intent to deprive her of the value of her original agreement and fraudulently induce her to sign the new agreement.

51. Funcheon relied on what Defendant Laag had told her in signing the revised EA.

52. Funcheon has incurred, as a result of this, damages exceeding $20M.

53. The structure of Funcheon's EA matched those of Plaintiffs and other early employees, confirming that her original EA contained no discrepancies.

54. As with Laag's other fraudulent re-trades of employee equity, nearly all changes in Funcheon's new agreement appeared in Exhibit C, the Incentive Plan, and were designed to lower the value of the Incentive Plan: the new agreement contained materially fewer phantom units.

iii. <u>Former Executive Vice President of Product Delivery Jonathan Gibbs</u>

55. On or about April 7, 2023, Defendant Laag emailed Jonathan Gibbs (then Defendant Prime's former EVP of Product Delivery), stating that PSP1 had been finalized and submitted for Board approval.

56. In that April 7, 2023 email, Defendant Laag: (i) referenced an implied per-unit value of approximately $550 per unit on vested units; (ii) stated that certain milestone values had been adjusted upward based on Board feedback; (iii) indicated that those adjustments would need to be discussed with employees and reflected in updated EAs; and (iv) represented that company performance metrics had been determined by the Board.

57. That April 7, 2023 communication was fraudulent: Defendant Laag attributed measurable value to Defendant Prime units and acknowledged that NAV milestones had been achieved and increased, while telling Gibbs that PSP1 was a faithful implementation of existing obligations. Defendant Laag, however, knew PSP1 materially deviated from Gibbs's EA by introducing higher NAV hurdles, strike prices, subjective performance gates, an eight-year vesting term, and a valuation formula that produced a negative value of Prime, all not in the original EA and removed the non-discretionary bonus from Gibb's EA.

58. Defendant Laag sent this communication to induce Gibbs to accept PSP1 as a substitute for his contractual rights without understanding the economic reduction being imposed.

59.    Gibbs relied on these false statements in signing a revised EA.

iv.    Former Chief Commercial Officer Chris Sumter

60.    On July 10, 2023 — days before the Ares transaction closed on July 19, 2023 — Defendant Laag emailed Defendant Prime's former Chief Commercial Officer Chris Sumter, outside the purview of human resources, with subject line "EA Update, Urgent." Upon information and belief, in that email, Defendant Laag falsely represented to Sumter that his EA was flagged in the due diligence for the Ares transaction, and as a final due diligence item, Sumter was supposedly required to execute a revised EA.

61.    Ares did not, upon information and belief, specifically flag Sumter's EA as an impediment to closing the transaction.

62.    Defendant Laag knew these statements to be false, and, upon information and belief, made them to make Sumter believe closing the Ares transaction depended on executing a new EA and thus induce him to sign it at a substantially lower valuation compared to his original EA.

63.    Sumter relied on what Defendant Laag told him in executing the new EA.

64.    Upon information and belief, Defendants Laag and Pelz purposely targeted Gibbs, Sumter and Funcheon to sign new agreements, knowing that they collectively held a large number of units, oversaw a large number of direct reports who also held a significant number of units, and it was likely others would follow if they supported the new program.

v.    Other Employees

65.    Defendants' scheme, which began in at least February 2021, has continued to the present, with repeated acts of fraud committed against employees over at least 4 years to claw back phantom equity and other compensation, including: in late 2025 or early 2026, Defendants

attempted to fraudulently induce Senior Vice President William King to sign a new EA to claw back contractually agreed upon incentive compensation; Defendants emailing a November 2025 retention letter to Senior Solutions Engineer Scott Kuebler offering phantom share units with values ranging from $362,000 to $1,520,000; upon information and belief, offered phantom equity to approximately 50 employees, gave out zero grant awards, paid out less than $5m in compensation related to phantom equity while the company grew by 4,000%, and have not held phantom equity obligations on Defendant Prime's balance sheet since 2021; and finalizing PSP2 grants to employees at substantially different valuations than what is owed to them under their EAs, thereby fraudulently depriving them of the value of their own EAs.

E.    Defendants Try to Fraudulently Induce Plaintiffs to Sign New Agreements

66.    Starting in mid-2023, Defendants Laag and Pelz communicated to Plaintiffs in writing that their Incentive Plan, Non-Discretionary Performance Fees and Employee Co-Invest Rights were worthless.

67.    While telling them their EAs are worthless, Defendants Laag and Pelz pressured Plaintiffs to accept and sign the new PSP1 that Defendants had constructed, which was also worthless – as Defendants later admitted.

68.    Defendants Laag and Pelz were continuing to sell equity at increasingly higher valuations and were not including in their financials the material compensation owed to Plaintiffs and other employees.

69.    On July 9, 2023, Plaintiff Maxwell notified Defendant Pelz in writing that the PSP1 NAV milestone tables and mechanics did not align with the EAs, indicating that bringing PSP1 into alignment would require issuing a materially higher number of units, and that, in sum and

substance, the draft reflected a substantive re-trade, not a faithful implementation of obligations under the existing EAs and refused to sign it.

70. On or about July 14, 2023, Plaintiffs Maxwell and Patito confronted Defendants Laag and Pelz regarding discrepancies between their EAs and PSP1. In response, Defendants Laag and Pelz claimed that their lawyer was still making edits to the PSP1 draft, and that it was "not worth going through."

71. Defendants Laag and Pelz were not actively working on the PSP1 plan – especially one that aligned with Plaintiffs' EAs. They purposefully delayed addressing the issue to induce Plaintiffs' to continue working for Defendants, while having no intention of honoring their EAs.

72. In August 2023, six months after bonuses were deemed earned, Defendants Laag and Pelz separately summoned Plaintiffs Maxwell and Patito to individual meetings to discuss their 2022 performance, 2022 bonus, 2024 salary increases, and purported new equity units. Following these meetings, Plaintiffs raised repeated objections to Defendants' proposed equity units, highlighting that they deviated materially from the structure of their EAs.

73. In November 2023, the Board approved a resolution purportedly amending PSP1, approving payouts at years three, six, and eight. Upon information and belief, the Board members involved in approving the amendment included: Defendant Laag; Marc Leffin; Macquarie's Global Head of Infrastructure & Energy Capital Mark Bradshaw; Macquarie's Head of Americas Digital Infrastructure for the Infrastructure & Energy Capital Sam Southall; Ares Managing Director Matthew Eid-Holm; and Siemens Equity Investment Head Jason Thompson. The Board, in doing so, re-approved a valuation formula that produced a negative value and Board members in the same year bought and sold primaries at a significantly higher value.

74. In November 2023, Thompson emailed Defendants Laag and Pelz asking for details regarding PSP1, including whether there was any accrued balance sheet liability. Upon information and belief, Defendants Laag and Pelz did not respond to Thompson's inquiry.

75. After that November 2023 Board resolution, Defendants Laag and Pelz circulated a further revised version of the PSP (now "PSP2") to many employees, including Sumter, Gibbs, and Funcheon, that, upon information and belief, went well beyond the November 2023 Board resolution, introducing additional changes that had never been sanctioned. Plaintiffs Maxwell and Patito were excluded from that distribution entirely.

76. Upon information and belief, Defendants Laag and Pelz excluded Plaintiffs Maxwell and Patito from the PSP2 distribution because Plaintiffs were among the few employees who understood how the PSP1 and PSP2's revised mechanics, compared to the terms of their EAs, would significantly reduce the value of all employees' compensation.

77. Throughout 2024 and into 2025, Defendants Laag and Pelz continued to pressure Plaintiffs Maxwell and Patito to agree to amending their EAs.

78. In January 2024, Defendants Laag and Pelz tried to pressure Plaintiffs Maxwell and Patito to agree to amending their EAs by conditioning salary increases on acceptance of PSP2, explicitly stating in written correspondence on January 6, 2024, that the packages were "agreed in total or not at all" when employees declined to give up their original EA rights.

79. To that end, in January 2024, Defendants Laag and Pelz emailed Plaintiffs documents titled "EA & Comp Comparison Letters" containing materially misleading or outright false information regarding Plaintiffs' EAs and the manner in which their Incentive Plan's (i.e., the phantom equity) value was derived: they showed how the NAV had increased and that the

Incentive Plan had value, while also telling Plaintiffs that, based on the PSP1 and PSP2 formula, the units were worthless.

80.    Specifically, the letters attempted to alter the text of Article 3.3 of Plaintiffs' EAs by inserting language that did not exist in the original contracts:

> i) EA version: "3.3. Incentive Plan. EMPLOYEE shall be eligible to participate in the Incentive Plan attached hereto as Exhibit C, and shall be subject to all of the terms and conditions set forth therein immediately upon execution";
>
> ii) Laag / Pelz version: "3.3. Incentive Plan. EMPLOYEE shall be eligible to participate in the Incentive Plan attached hereto as Exhibit C, and shall be subject to all of the terms and conditions set forth therein immediately upon execution of the Incentive Plan [emphasis added]."
>
> EA version: "3.3. Initially 2.5-5.0% of the carried interest (performance fee) on all deals Company closes";
>
> Laag / Pelz version: "Carried Interest: 2.5-5.0% of the carried interest that Company attains from JV deal by deal."

81.    Defendants Laag and Pelz falsely claimed this language existed in the EAs, when it did not.

82.    Defendants Laag and Pelz further falsely stated that the metrics in the EAs needed to be changed because they rendered the value of the Incentive Plan "worthless." By labeling those cash entitlements as valueless, Defendants Laag and Pelz hoped that Plaintiffs would simply accept any alternative sum.

83.    Other false or materially misleading statements Defendants Laag and Pelz made in this January 2024 letter included falsely stating that the strike prices in the EAs were added at the Board's direction, despite the Board previously approving the EAs without strike prices, and that the Incentive Plan could not legally vest in less than five years. Both statements were knowingly false, as the Board did not direct Defendants to do so.

84.     As late as February 2026, Defendants Laag and Pelz maintained that both Plaintiffs' EAs, PSP1, and PSP2 were worthless based on their applicable formulas, despite the EAs having a formula that produces a market value. Accordingly, Defendants Laag and Pelz stated to Plaintiffs that they need Board approval to modify PSP1 and PSP2 formulas to bring it in line with Prime's market value. Upon information and belief, Defendants never did so.

85.     Taken together, the January 2024 letter constitutes both an admission of the Company's non-performance under the EA and an effort to leverage that non-performance into a forced renegotiation on terms more favorable to Defendant Prime.

86.     Plaintiffs knew, however, the true value of the Incentive Plan (i.e., their phantom equity), Non-Discretionary Performance Fee and Employee Co-Invest Rights, and thus refused to accept Defendants Laag and Pelz's proposals.

87.     Defendants Laag and Pelz further attempted to pressure Plaintiffs to amend their EAs by directing Human Resources to issue formal disciplinary notices against Plaintiff Patito for discussing compensation with colleagues, labeling federally protected concerted activity as a breach of confidentiality and threatening termination.

88.     Throughout this pressure campaign, whenever Defendants Laag and Pelz discussed with them modifications to their EAs, Plaintiffs Patito and Maxwell always made clear they did not agree to any modifications.

89.     On March 28, 2025, while Defendants Laag and Pelz were trying to get employees to agree to PSP2, Ares, including Eid-Holm, proposed to Defendant Laag establishing a Board-level Compensation Committee with the primary goals of conducting a gap analysis between the EAs and the proposed phantom share plan and implementing a board-approved management

incentive plan. To Plaintiffs' knowledge, no independent compensation consultant was ever retained, and no independent review was performed.

90.    On April 1, 2025, Defendant Laag shared an Excel spreadsheet with Ares stating that Defendant Prime was "way behind on vesting options versus what could and should have been expected," and acknowledged approximately 50,000 vested units as of March 2025. Nonetheless, Defendant Prime's FY 2023 and FY 2024 financial statements contained no disclosure or accrual for vested units or any related compensation liability. Today, those vested units would amount to approximately $200 Million.

91.    On April 5, 2025, Defendant Laag instructed Southall of Macquarie and Eid-Holm of Ares to respond to Plaintiffs' whistleblower complaint and relay Laag's position, disrupting Plaintiffs' attempts to engage with independent Board members. In doing so, Laag displaced independent Board oversight and placed himself — an interested, conflicted party — in control of reviewing Plaintiffs' whistleblower complaints.

92.    By the end of August 2025, Defendant Pelz dismissed Plaintiffs' concerns, admitted that Defendant Laag had not adhered to the Board's recommendations for independent review, and rejected Plaintiff Maxwell's multiple requests for a meeting with all stakeholders as ridiculous and taunting him about the Board's historical in-action.

F.    Defendants' Material Misrepresentations and Non-Disclosures to Auditors and Investors

93.    While they were scheming to defraud their employees, Defendants were engaged in a separate and distinct effort to mislead the Board of Directors and investors to maintain control and to attract capital.

    i.    The Macquarie Transaction (April 27, 2023)

94.    At the time of the $50 million preferred equity upsize with Macquarie on April 27,

2023, Macquarie was not informed of the extent that binding EAs granting employees incentive compensation — including phantom equity, Non-Discretionary Performance Fees, and Employee Co-Invest Rights — were already in place and already generating material compensation obligations. The EA compensation framework was omitted *entirely* from the Macquarie transaction disclosures.

      ii.       <u>Ares and Siemens Transactions (July 2023)</u>

95.     While Ares was doing its due diligence, it specifically flagged the Incentive Plan (i.e., the phantom share program) and advised that the program should be finalized and that Defendant Prime faced liability exposure to claims from non-implementation.

96.     Despite this warning, Defendant Prime's disclosures to investors remained inconsistent and misleading:

- In July 2023 emails to Macquarie Managing Director Sam Southall, Defendant Laag materially misrepresented Defendant Prime's obligations under the EAs, while acknowledging "the milestones with regards to the Prime NAV have been attained" and all 185,000 units could "could actually be vested (in the money)" under the Management Stock Option Plan ("MSOP") program agreed with Macquarie, indicating a minimum $550 Million NAV; and confirmed Southall's question that "no representations or formal commitments have been made, as this would be outside of the LLCA / governance to do so without authority at the BOD level" despite EAs claiming full authorization. Defendant Laag further stated the revised structure (i.e. PSP1) has "been very favorable to [Macquarie]" and this is a "big win for MQ and the Prime shareholders."

- On July 8, 2023, Defendants Laag and Pelz represented to Ares and its agents that units had already been granted to employees under fixed vesting schedules, and that some units were already vested.

97.     These contradictory representations — made within days to different parties — underscore that Defendants Laag and Pelz were tailoring their disclosures to serve their own interests rather than accurately disclosing Defendant Prime's actual compensation obligations.

98.     Defendant Prime identified the Incentive Plan as a material obligation in the "Absence of Material Changes" disclosure in the Ares transaction. Yet no corresponding liability has ever been recognized, accrued, or disclosed in Defendant Prime's financial statements to this day. Defendant Pelz acknowledged in writing the inconsistency when he told Defendant Laag before the Ares transaction closed: "it needs to be a disclosure — approved or not. We otherwise are indirectly stating it does not exist and is no obligation."

99.     Defendant Pelz later maintained no obligation existed under the Incentive Plan because, as explained above, he repeatedly took the knowingly false position that the EA grants across all Incentive Plan participants were worthless.

100.    Defendants Laag and Pelz concealed and minimized the outstanding obligations and accrued liabilities created by the EAs to induce Ares and Siemens to close the transaction and invest in Defendant Prime.

101.    In or around July 2023, Ares committed approximately $350 Million to Defendant Prime.

102.    In or around the latter half of 2023, Siemens committed approximately $90 Million to Defendant Prime.

iii.     The Snowhawk Transaction (July 2025)

103.    By the time of the July 2025 Snowhawk transaction, the pattern of non-disclosure had become systematic.

104.    Defendant Pelz uploaded standard EA templates to the data room rather than the actual executed agreements, which contained materially different compensation economics.

105.    Defendant Pelz communicated directly with Ernst & Young (the sell-side financial diligence firm) and Snowhawk via phone calls, bypassing the written diligence process and ensuring that the key compensation obligations were not reflected in the documentary record.

106.    On June 29, 2025, during a diligence call with Snowhawk, Defendant Pelz stated that Defendant Prime had no payout obligation under the PSPs and that any obligation would arise only upon adoption of a new valuation framework — solidifying the position that the PSP1 and PSP2 formulas rendered the units worthless.

107.    On July 11, 2025, Plaintiff Maxwell forwarded routine due diligence questions related to the PSPs to Defendant Prime's auditor since 2021, Tim Mahoney of CLA. Mahoney responded that he was unaware of any management incentive program, confirming that Defendant Prime had not fully disclosed its compensation obligations to its auditor. As Prime's value grew, the vested obligations became a material liability compared to Prime's book value. Plaintiffs Maxwell and Patito followed up with Defendants Laag and Pelz via email and Teams regarding these issues.

108.    Defendant Prime nonetheless closed the Snowhawk transaction on July 17, 2025, representing that the EAs followed a standard template, while material compensation obligations — including vested units, agreed deferred bonus structures, Non-Discretionary Performance Fees, and Employee Co-Invest Rights — were omitted from disclosure.

109.    In July 2025, in response to Plaintiff Patito's efforts to ensure accurate compensation disclosures to the Board and to Ernst & Young in connection with the Snowhawk transaction, Defendant Laag characterized the April 1, 2025 whistleblower letter to the Board sent by Patito and Maxwell as a "mistake" and warned Plaintiff Patito, in sum and substance: "if you have no trust and don't learn from your mistakes … I am not sure how we can help or be partners."

This statement was a thinly veiled threat intended to chill Plaintiff Patito's protected efforts to ensure accurate investor and auditor disclosures and constitutes a further act in furtherance of the fraudulent scheme alleged herein.

110.    The Snowhawk transaction occurred at a valuation of approximately $2.15 Billion — approximately 1,400% increase from EA commencement and >40% higher than the highest NAV hurdle in the EAs.

111.    With the Snowhawk transaction closed, Defendant Laag retained majority ownership, he may have otherwise lost.

112.    After the Snowhawk transaction closed, on July 24, 2025, during a discussion between Defendant Pelz, auditor Tim Mahoney of CLA, legal tax counsel and Plaintiff Maxwell, Mahoney identified three primary concerns regarding the Incentive Plan: (i) ensuring it was properly implemented and legally valid; (ii) verifying employees were not subjected to incorrect tax treatment; and (iii) addressing a substantial liability that required reporting in Defendant Prime's financial statements. Mahoney expressed that, based on information then available, the Incentive Plan should be implemented and reported in Defendant Prime's financials, noting the plan was "clearly in the money." This discussion re-emphasized the need to remedy these issues.

G.    Defendants' Pursuit of Grain Management Transaction to Eliminate Independent Oversight

113.    On or about March 30, 2026, upon information and belief, Defendants Laag and Pelz closed a transaction with Grain Management for $500,000,000, pursuant to which Grain would provide preferred equity to Defendant DRH, the proceeds of which would be used by Defendant DRH to (i) acquire, in whole or in part, the equity interests held by Wholesale DC Asset Holding, LLC ("WDCAH"), an entity jointly owned and controlled by Ares and Macquarie

(Southall and Eid-Holm), which held an equity interest in Defendant Prime, and (ii) refinance all or a portion of the OneIM loan at DTH.

114. Absent a transaction by March 31, 2026, OneIm could have foreclosed on Defendant Laag's equity in Defendant Prime and he would have had to transfer his shares to Macquarie. The Grain transaction was designed to avoid this.

115. The Grain transaction entrenched Defendant Laag's control over Defendant Prime by eliminating Macquarie and increasing Defendant Laag's ownership and control and increased Defendant Laag's share of the profits.

116. In the Grain transaction, upon information and belief, Defendants Laag and Pelz did not disclose to Grain the outstanding obligations due under the EAs, nor did they disclose Plaintiffs' claims.

117. The Grain transaction was structured through Defendant DRH—which Defendant Laag indirectly controls and is also a member of Defendant Prime.

118. Before the Grain transaction closed, Plaintiffs had already asserted their claims through a formal demand letter dated February 3, 2026 and, even before that, sent a whistleblower letter on April 1, 2025 to Ares and Macquarie (the shareholders selling their equity to DRH) and made demands to Defendants Laag and Pelz for them to honor their EAs.

119. When the Grain transaction closed, Plaintiffs had binding contractual claims against Defendant Prime totaling at least $88 million under their EAs. Upon information and belief, Grain acquired its position without that knowledge.

120. Upon information and belief, neither the Incentive Plan liabilities, which Ares acknowledged, nor Plaintiffs' pending claims were accurately or fully disclosed to Grain.

H.       Defendants Leverage Their Fraud for Personal Financial Gain

121.     Defendants Laag and Pelz's fraudulent scheme served a further purpose: to personally enrich themselves and Defendant Prime's other shareholders.

122.     Defendants Laag and Pelz allocated to themselves approximately 26,500 phantom shares each, for a total of 53,000 shares or approximately 29% of the original 185,000 unit pool.

123.     For every dollar not paid to employees as compensation, Defendants directly benefited. This incentive, in turn, motivated them to strip employees of their equity to prevent dilution and protect the value of their equity.

I.       Plaintiffs Are Owed Significant Sums

124.     When they were constructively discharged, Defendants did not pay Plaintiffs their Non-Discretionary Performance Fees, Discretionary Bonus, Co-Invest Rights, or obligations under the Incentive Plan in Exhibit C of their EA.

125.     Plaintiffs' damages arise under separate entitlements in their EAs: (1) the Non-Discretionary Performance Fee, (2) Employee Co-Invest Rights, (3) the Incentive Plan phantom equity and (4) Discretionary Bonus.

i.       Valuing the Incentive Plan

126.     The Exhibit C Incentive Plan uses a defined methodology to determine how much each Plaintiff is owed. In order to achieve the first NAV milestone, Defendant Prime had to grow by over 200%. To achieve the last milestone, Prime had to grow by over 1,000%. Today, Prime has grown by over 4,000% since Plaintiffs' EAs were executed.

127.     Defendant Prime's NAV is presently greater than $6 Billion and its unit value is likely greater than $3,500.

128. Defendants Laag and Pelz have, with other employees, used a different methodology to falsely show the Incentive Plan has no value. They, for example, used a multiple on historical EBITDA, deducted debt obligations, and arrived at a negative equity value, while simultaneously selling equity in the market at values stated above. That formulation has no support in the EAs, nor, upon information and belief, materially all of the approximately 50 EAs executed with phantom equity.

ii.    Non-Discretionary Performance Fee

129. Plaintiffs Patito and Maxwell are each entitled to their specified percentage of the Non-Discretionary Performance Fee on all deals Defendant Prime has closed since the start of their employment.

130. The calculation requires: (1) identifying all deals Defendant Prime closed from February 2022 (including deals completed with Prime shareholders) to date; (2) determining the performance fee attributable to each transaction; and (3) applying the applicable percentage to each deal.

iii.   Plaintiffs' Damages

131. Plaintiff Patito is owed at least $189.6 Million for the three categories of compensation set forth in his EA: $60.9 Million for the Incentive Plan under Exhibit C in his EA; $65.4 Million for Non-Discretionary Bonus under Exhibit B in his EA; and $62.4 Million for the Employee Co-Invest Rights under Exhibit B.

132. Plaintiff Maxwell is owed at least $66.4 Million for the three categories of compensation set forth in his EA: $36.6 Million for the Incentive Plan under Exhibit C in his EA; $19.6 Million for Non-Discretionary Bonus under Exhibit B in his EA; and $9.4 Million for the Employee Co-Invest Rights under Exhibit B.

133.    In total, Defendants owe Plaintiffs at least $256 Million: Plaintiff Patito $189.6 Million and Plaintiff Maxwell $66.4 Million.

J.    Defendant DRH Alter Ego Status

134.    Defendant DRH is the alter ego of Defendants Prime and Laag, as: (1) it is dominated and controlled by them and is functionally inseparable from Defendant Prime, sharing common officers, directors, and decisionmakers with Defendant Prime – including Defendants Laag and Pelz; (2) conducts no operations of its own, has no employees, payroll, independent office, infrastructure, or any other business holdings besides those in Defendant Prime or entities controlled by Defendant Laag; (3) is undercapitalized; commingles corporate assets, funds, and opportunities in Defendant Prime, and other related entities such as Defendant DTF, DRG, and DTH; and is completely dominated by Defendants Prime, Laag and Pelz.

135.    Defendants have used Defendant DRH as a holding place for the value (estimated at approximately $4.0 Billion today) Plaintiffs' work created at Defendant Prime and leveraged that value to engage capital partners, such as OneIM and Grain, in financing arrangements that have enabled Defendant Laag to maintain and increase majority control over Defendant Prime. Taken together, these moves shifted the financial benefit of Plaintiffs' work to DRH, while Defendants Laag and Pelz asserted that Defendant Prime's — the company that actually owes Plaintiffs under the EAs — value for the purposes of payment of employee compensation was less than zero.

FIRST CAUSE OF ACTION<br>Breach of Contract<br>(Against Defendant Prime)

136.    Plaintiffs repeat and reallege every allegation made in the above paragraphs of this Complaint.

Page 26 of 48

137.    Defendant Prime offered Plaintiffs the EAs.

138.    Plaintiffs accepted the EAs.

139.    The EAs constitute valid, enforceable contracts between each Plaintiff and Defendant Prime, supported by adequate consideration.

140.    Plaintiffs performed their obligations under their respective EAs, including providing services as key individuals contributing directly to the growth and value of Defendant Prime from approximately $140 Million to over $6 Billion in NAV.

141.    Defendant Prime, through Defendants Laag and Pelz, breached their EAs in numerous ways, including:

a.    Compensation owed under Exhibit B

i.    Failing and refusing to calculate, accrue, and pay the Non-Discretionary Performance Fee owed on all deals Prime closed during Plaintiffs' tenure and each of the Macquarie, Ares, Siemens, Snowhawk, and other transactions closed by Prime from February 2022 through Plaintiffs' constructive discharge;

ii.    Failing and refusing to offer Plaintiffs the pro-rata Employee Co-Invest Rights contemplated by Exhibit B;

b.    Administration of the Incentive Plan required by Article 3.3 and Exhibit C

i.    Failing to recognize Plaintiffs' eligibility to participate in the Incentive Plan immediately upon execution of the EAs as Article 3.3 requires;

ii.    Failing to grant Plaintiffs the upfront phantom equity allocation specified in Exhibit C and failing to apply the vesting schedule for that grant beginning six months after employment commencement;

iii.    Failing to grant Plaintiffs Milestone Options for each of the NAV thresholds Prime crossed during Plaintiffs' tenure, applying the consolidated pro-forma NAV methodology defined in Exhibit C in alignment with market value;

iv.    Failing to pay out the phantom equity that is owed under Exhibit C.

c.    Unilaterally implementing substitute compensation programs (PSP1 and PSP2) that materially deviated from the EAs without the written amendment required by Article 10.2.

142.    As a direct and proximate result of Defendant Prime's breaches, Plaintiffs have suffered damages in amounts to be proven at trial, including but not limited to at least $256 Million: Plaintiff Patito $189.6 Million and Plaintiff Maxwell $66.4 Million.

143.    As the prevailing party, Plaintiffs are entitled to their attorneys' fees and expenses under their EAs.

<u>SECOND CAUSE OF ACTION</u>
Promissory Estoppel
(Against All Defendants)

144.    Plaintiffs repeat and reallege every allegation made in the above paragraphs of this Complaint.

145.    Assuming Exhibit C is held to be not part of a binding contract, Plaintiffs assert in the alternative promissory estoppel.

146.    Defendants Laag, Pelz and Prime made clear and unambiguous promises to Plaintiffs that they would receive phantom equity as set forth in their EAs and in subsequent written and oral representations, including repeated assurances that their equity would be implemented and would be honored.

147.    Plaintiffs reasonably and foreseeably relied on these promises by continuing to serve as employees at Prime, contributing to Prime's substantial growth and forbearing from immediate enforcement of their EA rights for a period of over three years.

148.    Plaintiffs' reliance was to their detriment, including the loss of the compensation described herein and forgoing employment opportunities.

149.    Enforcement of Defendants' promises is necessary to prevent substantial injustice.

THIRD CAUSE OF ACTION
Violation of the Racketeer Influenced and Corrupt Organizations Act
18 U.S.C. § 1962(c)
(Against Individual Defendants Laag and Defendant Pelz)

150.    Plaintiffs repeat and reallege every allegation made in the above paragraphs of this Complaint.

151.    Defendants Laag and Pelz are "Person(s)" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c) in that each is either an individual, corporation, or limited liability company, or other person capable of holding a legal interest in property.

152.    At all relevant times, Defendants Laag and Pelz existed separately and distinctly from the Enterprise (described below) and controlled and directed the activities of Defendant Prime and its affiliated entities. Defendants Laag and Pelz are distinct from the Enterprise because they operated in their personal capacities as the architects of the fraudulent scheme, using the corporate machinery of Defendants Prime and DRH as instrumentalities. The Enterprise has an existence separate from the individual Defendants Laag and Pelz: it maintains its own legal structure, assets, offices, bank accounts, investor relationships, and contractual obligations. Defendants Laag and Pelz exploited the Enterprise's corporate infrastructure and legitimacy to lend credibility to their scheme, while directing the Enterprise's affairs for their own personal benefit rather than the Enterprise's. The Enterprise would continue to exist even if Defendants

Laag and Pelz were removed, and the predicate acts were committed through the Enterprise rather than by it.

153.    Defendant Laag, as Chief Executive Officer and majority shareholder of Defendant Prime, exercised ultimate authority over Defendant Prime's business operations, compensation decisions, investor relations, and financial disclosures.

154.    Defendant Pelz, as Chief Financial Officer and shareholder, directed Defendant Prime's financial reporting, managed its relationships with outside auditors and investors, and controlled the flow of information through Defendant Prime's diligence processes.

155.    Together, Defendants Laag and Pelz made all material decisions regarding the design and implementation of employee compensation programs and personally directed the day-to-day affairs of the Enterprise in furtherance of the scheme alleged herein.

156.    Defendants Laag and Pelz are individuals and instrumental in the furtherance of the Enterprise, each of whom engaged in wire fraud or substantially assisted in carrying out the wire fraud through the use of intentionally and materially misleading statements and communications, as outlined *supra.*

157.    Defendants Laag and Pelz utilized the corporate entities Defendants Prime and DRH to assist, enable, and perpetuate their fraudulent schemes.

158.    Specifically, Defendants Laag and Pelz used electronic communications including email, telephone, Microsoft Teams, PowerPoint presentations, and traditional written correspondence — all transmitted in interstate and foreign commerce — to carry out their fraudulent scheme, against current and past employees, thereby committing wire fraud in violation of 18 U.S.C. § 1343 on multiple occasions and as a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1).

159.    Individual Defendants Laag and Pelz violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

160.    At all relevant times, Defendants Laag and Pelz directed the affairs of Defendant Prime, often circumventing the Board. Upon information and belief, such circumvention includes executing the EAs and granting Plaintiffs and other employees incentive compensation without Board approval.

161.    Defendants Prime and DRH constitute an "Enterprise" within the meaning of 18 U.S.C. § 1961(4). This Enterprise is engaged in, and its activities affect, interstate and foreign commerce.

162.    Defendants Laag and Pelz were persons employed by and associated with the Enterprise within the meaning of 18 U.S.C. § 1962(c), and they conducted and participated, directly and indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

163.    The Enterprise and its activities had a defined common purpose: maintaining Defendants Laag and Pelz's majority control over Defendant Prime and its affiliated entities while defrauding Defendant Prime's employees of their rightful economic interests through a continuing pattern of racketeering activity.

164.    The predicate acts of wire fraud perpetrated by Defendants against employees are referenced above and include, but are not limited to: (i) fraudulently inducing Barber to execute a new EA and give up equity by falsely claiming it was protected in Defendant Prime; (ii) fraudulently inducing Funcheon to execute a new EA and give up phantom equity by falsely claiming there was an error in her original EA; (iii) attempting to or actually fraudulently inducing former EVP Gibbs to execute a new EA and give up phantom equity by misrepresenting PSP1

terms; (iv) fraudulently inducing Sumter to execute a new EA and give up phantom equity by falsely stating that his EA had been flagged in the Ares transaction due diligence; (v) attempting to fraudulently procure Plaintiffs Maxwell and Patito's execution of new EAs to strip them of equity contractually promised to them, including transmitting the "EA & Comp Comparison Letters" to Plaintiffs Maxwell and Patito in January 2024, inserting non-existent language into Plaintiffs' EAs or distributing valuations to Plaintiffs asserting that their equity was worthless while selling equity at significant values; and (vi) Defendants' present and continued efforts to defraud employees of their earned compensation, including against SVP William King, who Defendants attempted to solicit to sign a new EA to strip him of his contractually promised equity.

165.    The members of the Enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of the racketeering activity.

166.    The predicate acts, for purposes of the RICO claims, concern the misrepresentations to and actions directed at Plaintiffs and other employees, which is ongoing.

167.    The phantom equity at issue is a deferred cash-compensation arrangement.

168.    The predicate wire fraud acts targeted employees in the employment context.

169.    These predicate acts are related, in that each served the enterprise's common purpose of suppressing employee compensation and allowing individual Defendants Laag and Pelz to retain ownership and control over Defendants Prime and DRH to enrich themselves, and they constitute a pattern of racketeering activity spanning more than five years and continuing to present, constituting both closed-ended and open-ended continuity.

170.    Closed-ended continuity is demonstrated by Defendants' fraudulent conduct extending from at least February 13, 2021, when they fraudulently induced Barber to enter into a

new EA and forfeit compensation owed to him with false promises that it was protected in Defendant Prime.

171. Open-ended continuity is demonstrated by the fact that Defendants' pattern of racketeering activity is ongoing, threatens to continue indefinitely, and has become Defendants' regular way of conducting Defendant Prime's business. Defendants' most recent predicate acts include: (i) the finalization of PSP2 grants in December 2025 on the materially same fraudulent terms used to deprive Plaintiffs and other employees of their EA-based compensation; (ii) Defendants' continuing refusal, through the date of this Complaint, to recognize, accrue, or disclose vested phantom equity, Non-Discretionary Performance Fees, and Employee Co-Invest Rights in Defendant Prime's financial statements, despite Defendant Prime's own auditor (CLA) confirming in July 2025 that the plan was "clearly in the money" and should be implemented and reported; and (iii) Defendants' continued attempts to further strip employees of their earned compensation. The same scheme — using interstate wire communications to misrepresent or conceal Defendant Prime's EA-based compensation obligations to employees, the Board, and auditors— is the means by which Defendants have conducted Defendant Prime's affairs for more than three years and, absent judicial intervention, will continue to use to conduct Defendant Prime's affairs going forward, including in connection with anticipated future capital raises, refinancings, and strategic transactions.

172. Furthermore, these activities constitute racketeering activity within the meaning of 18 U.S.C. § 1962(c), (d), 18 U.S.C. § 1961(6) because they violate 18 U.S.C. §§ 1341 and 1343.

173. Defendants Laag and Pelz, each of whom are persons associated with, or employed by, the Enterprise, did knowingly, willfully and unlawfully conduct or participate, directly or

indirectly in the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1).

174.    For the purpose of executing their scheme or artifice, Defendants caused delivery of various documents and things by the U.S. mail or by private or commercial interstate carriers or received such therefrom.

175.    Defendants Laag and Pelz had the specific intent to engage in the substantive RICO violations as alleged herein.

176.    The purpose of this fraud was multi-fold: (i) to prevent shareholder dilution of Defendants Laag and Pelz's shareholdings in Defendant Prime; (ii) to enrich themselves by inflating the value of their pecuniary interests, in Defendant Prime; and (iii) to allow Defendant Prime to avoid paying out incentive compensation to employees.

177.    As a direct and proximate result of this racketeering activity, Plaintiffs have suffered injuries to their business and property, including loss of Non-Discretionary Performance Fees, phantom equity, Employee Co-Invest Rights, deferred compensation as described herein. Plaintiffs' injuries were caused directly by the predicate acts of wire fraud — specifically, Defendants' fraudulent communications induced Plaintiffs to refrain from enforcing their contractual rights, and to forgo alternative employment, while Defendants simultaneously dissipated corporate value through self-dealing.

178.    The pattern of racketeering activity consists of multiple acts of wire fraud, in violation of 18 U.S.C. § 1343, committed by Defendants Laag and Pelz through electronic communications transmitted in interstate and foreign commerce, including those described above, and numerous additional emails, electronic documents, and communications made in furtherance of the scheme from at least 2021 through the present.

179. These acts of wire fraud are related in that they share the same or similar purposes (suppressing and eliminating employee compensation to maintain control and prevent dilution), methods of commission (electronic communications containing material misrepresentations), participants (Defendant Laag, Defendant Pelz, and their entities), and victims (Plaintiffs and other Defendant Prime employees).

180. The predicate acts form a pattern that is distinct from a single act with a single objective. Rather, the scheme involved numerous separately conceived and executed fraudulent inducements directed at different employees at different times (Barber in 2021, Funcheon in March 2023, Gibbs in April 2023, Sumter in July 2023, Plaintiffs from 2023 through 2026, and King in late 2025 or early 2026), each requiring its own tailored misrepresentations transmitted through separate interstate wire communications (i.e., email). The predicate acts involve multiple distinct victims (at least six named individuals and approximately 50 employees in total), multiple distinct objectives (preventing dilution and securing personal financial benefits), and multiple distinct methods (falsified documents, misrepresented plan terms, coercive tie-ins, and concealment from auditors). This breadth and variety distinguish the pattern from an isolated fraud and demonstrate the open-ended continuity and threat of continued criminal activity that RICO was designed to address.

181. The pattern of racketeering activity has continued for more than five years, constituting open-ended continuity sufficient to satisfy the RICO continuity requirement.

182. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, attorneys' fees, and costs.

FOURTH CAUSE OF ACTION
Conspiracy to Violate the Racketeer Influenced and Corrupt Organizations Act
18 U.S.C. § 1962(d)
(Against All Defendants)

183.  Plaintiffs repeat and reallege every allegation made in the above paragraphs of this Complaint.

184.  Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

185.  By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the EAs, due diligence, financial reporting requirements, and activities concerning the implementation of the invalid PSP programs, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.

186.  Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy in violation of 18 U.S.C. § 1962(c).

187.  Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to defraud their employees, including in violation of 18 U.S.C. § 1962(c).

188.  Each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the schemes to deprive employees of equity Defendants contractually agreed to grant said employees to protect shareholder equity from dilution.

189.    The participation and agreement of each Defendant was necessary to allow the commission of this scheme and is demonstrable by Defendants' conduct, as Defendants Laag, Pelz, and Defendant Prime each were involved in transmitting materials and communications to employees upon which their fraudulent conduct was based. This includes Laag and Pelz who devised false calculations for Plaintiffs' EAs and drafted the PSP1 and PSP2 proposals in attempts to strip Plaintiffs and other employees of their phantom equity.

190.    Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

191.    The injuries to Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, tens of millions of dollars or more.

192.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' unlawful activities.

193.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

194.    The Court should also enter such equitable relief as it deems just and proper to preclude the Defendants from continuing in their illegal activity.

FIFTH CAUSE OF ACTION
Unjust Enrichment
(Against All Defendants)

195.    Plaintiffs repeat and reallege every allegation made in the above paragraphs of this Complaint.

196.    In the alternative, and only in the event Exhibit C is held not to constitute a binding contractual obligation, Plaintiffs assert unjust enrichment with respect to the value of services they provided to Defendants.

197.    Plaintiffs performed services for Defendant Prime in good faith as senior executives, including closing significant data center transactions that form the lion's share of Defendant Prime's value today, including projects SJC02, LAX01, ORD01, PHX01, DFW01 and AUS01, and facilitating multiple investor transactions generating billions of dollars in enterprise value. This growth represents a substantial appreciation in Defendant Prime's value from $140 Million to over $6 Billion.

198.    Defendant DRH directly benefited from Plaintiffs' work, and their elimination of Plaintiff compensation, by capturing a substantial portion of those benefits through (i) its appreciating equity stake in Defendant Prime, worth an estimated $3.9 Billion and (ii) upon information and belief, through its acquisition of WDCAH's approximately 15% interest in Defendant Prime, funded by Grain proceeds based on Defendant Prime's valuation.

199.    Defendants Prime, Laag and Pelz accepted Plaintiffs' services and derived direct and substantial benefit therefrom.

200.    Plaintiffs had a reasonable expectation of compensation for those services, including the phantom equity in Exhibit C and Non- Discretionary Performance Fees and Employee Co-Invest Rights in Exhibit B.

201.    Defendants extracted value from Plaintiffs' services while intending not to honor those agreements or pay the agreed compensation. It would be unjust and inequitable for Defendants to retain the benefits derived from Plaintiffs' services without providing reasonable compensation therefor.

202.    As a result, Defendants are liable to Plaintiffs in an amount equal to the reasonable value of the services rendered, to be proven at trial.

SIXTH CAUSE OF ACTION
*Quantum Meruit*
(Against All Defendants)

203.    Plaintiffs repeat and reallege every allegation made in the above paragraphs of this Complaint.

204.    Assuming Exhibit C is held to be not part of a binding contract, Plaintiffs assert in the alternative *quantum meruit*.

205.    Plaintiffs performed services for Defendants of a kind that are commonly compensated. Defendants accepted those services. Plaintiffs reasonably expected to be compensated for those services at the rates and in the manner set forth in their EAs.

206.    Defendants are accordingly liable to Plaintiffs for the reasonable value of services rendered, to be proven at trial.

SEVENTH CAUSE OF ACTION
Breach of the Implied Covenant of Good Faith and Fair Dealing
(Against Defendant Prime)

207.    Plaintiffs repeat and reallege every allegation made in the above paragraphs of this Complaint.

208.    Implied in every contract governed is a covenant of good faith and fair dealing, which prohibits either party from doing anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

209.    The EAs between Plaintiffs and Defendant Prime are valid, enforceable contracts that include this implied covenant.

210.    Defendant Prime, acting through Defendants Laag and Pelz, breached the implied covenant of good faith and fair dealing by engaging in a course of conduct calculated to deprive Plaintiffs of the benefits of their EAs, even where such conduct was not expressly prohibited by the EAs' literal terms. This claim is distinct from Plaintiffs' First Cause of Action because it addresses Defendant Prime's exercise of discretion and deployment of bad-faith tactics that fall outside the specific contractual provisions breached — including manipulation of valuation methodologies and deliberate non-implementation of the Incentive Plan.

211.    Defendant Prime's breaches of the implied covenant include:

(i)    Failing to pay Plaintiffs on the Incentive Plan in Exhibit C upon their separation;

(ii)    Failing to pay Plaintiffs the Non-Discretionary Performance Fee upon their separation and give them the Employee Co-Invest Rights under Exhibit B;

(iii)    Employing alternative valuation methodologies — including EBITDA-multiple analyses yielding negative equity values — to assert that Plaintiffs' phantom equity was worthless, while contemporaneously selling equity to outside investors at materially higher per-unit valuations, the benefit of which inured directly to Defendants;

(iv)    Defendant Prime's position that Exhibit C was implemented through PSP1 and subsequently PSP2, despite the EAs stating they are integrated documents;

(v)    Conditioning salary adjustments, bonuses, and other compensation on Plaintiffs' waiver of their original EA rights;

(vi)    Constructively narrowing the universe of "all deals Company closes" to not include any deals that Defendant Prime closed;

(vi)    PSP1 was designed to produce a payout of $0;

(vii)    PSP2 was deliberately left incomplete at the time of Plaintiffs' resignation. Defendant Prime delayed the timing of the implementation and amendment process to the point that when Plaintiffs were constructively discharged, they were deprived of any vested benefit under the EAs, PSP1 or PSP2. This allegation assumes PSP2 was binding on Plaintiffs.

212.    Defendant Prime's conduct was undertaken in bad faith and for the improper purpose of depriving Plaintiffs of compensation already earned under their EAs, while preserving the appearance of contractual performance.

213.    Plaintiffs performed their obligations under the EAs and at all times acted in good faith.

214.    The EAs are silent on when the phantom equity's value is determined for pay out and is accordingly construed against the drafter, Defendant Prime. Further, the implied covenant of good faith and fair dealing prevents Defendant Prime from delaying payment and then claiming that the lower separation-date value controls. It would be inequitable to let Defendant Prime benefit from its own delay by fixing valuation at a stale date. Under this covenant, the value of the equity is determined by when it is paid.

215.    With the EAs silent on the timing of payout of the Incentive Plan, the principles of equity and fairness determine when payment is due. Plaintiffs, accordingly, have the right to compel payment of vested phantom equity at their separation, as the employer's failure to establish a redemption mechanism or payout date constitutes a breach of the implied covenant of good faith and fair dealing.

216.    As a direct and proximate result of Defendant Prime's breaches of the implied covenant of good faith and fair dealing, Plaintiffs have suffered damages in amounts to be proven

at trial, including at least $256M: Plaintiff Patito $189.6M and Plaintiff Maxwell $66.4M, together with consequential damages and pre-judgment interest.

EIGHTH CAUSE OF ACTION
Retaliation in Violation of New York Labor Law § 740
(Against Defendant Prime)

217.    Plaintiffs repeat and reallege every allegation made in the above paragraphs of this Complaint.

218.    At all relevant times, Defendant Prime was an "employer" within the meaning of New York Labor Law § 740(1)(b), and Plaintiffs Patito and Maxwell were each an "employee" within the meaning of New York Labor Law § 740(1)(a).

219.    New York Labor Law § 740(2) prohibits an employer from taking any retaliatory action against an employee because such employee (a) discloses, or threatens to disclose, to a supervisor or to a public body an activity, policy, or practice of the employer that the employee reasonably believes is in violation of law, rule, or regulation, or that the employee reasonably believes poses a substantial and specific danger to the public health or safety; (b) provides information to, or testifies before, any public body conducting an investigation, hearing, or inquiry into any such activity, policy, or practice; or (c) objects to, or refuses to participate in, any such activity, policy, or practice.

220.    Plaintiffs engaged in protected activity within the meaning of New York Labor Law § 740(2), all of which Defendants were aware, including: (i) Plaintiff Maxwell's July 11, 2025 communication to Defendant Prime's independent auditor, Tim Mahoney of CLA, raising diligence questions from investors regarding compensation obligations, the integrity of Defendant Prime's financial statements, and the accuracy of disclosures made to outside the Board and third parties; (ii) Plaintiff Maxwell's participation in the July 24, 2025 discussion with Defendant Pelz,

Mahoney, and legal tax counsel concerning the proper implementation, tax treatment, and financial-statement reporting of Defendant Prime's compensation obligations; (iii) Plaintiff Patito's efforts in July 2025 to ensure proper compensation disclosures to investors, the Board and to Ernst & Young in connection with the Snowhawk transaction; (iv) Plaintiffs' repeated written and oral objections, beginning in July 2023 and continuing through 2025, to Defendants Laag and Pelz's implementation of PSP1 and PSP2 without the written amendments required under Article 10.2 of the EAs; (v) Plaintiffs' written objections that the "EA & Comp Comparison Letters" circulated in January 2024 contained materially false statements about the terms of Plaintiffs' EAs; and (vi) Plaintiff Maxwell's requests for Board-level review in 2025.

221. Plaintiffs reasonably believed that the activities, policies, and practices they disclosed and objected to violated federal and state laws, including common law fraud, New York Penal Law § 175 (falsifying business records), tax reporting obligations under IRC § 409A and GAAP requirements for disclosing contingent liabilities. Plaintiffs' disclosures concerned matters of public interest — specifically, material misrepresentations to investors, auditors, and regulatory bodies regarding Defendant Prime's financial obligations — and were not limited to private disputes over their personal compensation.

222. Defendant Prime, acting through Defendants Laag and Pelz, took retaliatory actions against Plaintiffs because of their protected activity, including: (i) directing Human Resources to issue formal disciplinary notices to Plaintiff Patito for discussing compensation with colleagues, mischaracterizing federally protected concerted activity as a breach of confidentiality and threatening termination; (ii) Defendant Laag's July 2025 written warning to Plaintiff Patito, characterizing Patito and Maxwell's whistleblower letter to the Board as a "mistake" and stating, in sum and substance, "if you have no trust and don't learn from your mistakes … I am not sure

how we can help or be partners," which Plaintiff Patito reasonably understood as a threat to his continued employment; (iii) withholding salary increases, bonuses, and other compensation expressly conditioned on Plaintiffs' waiver of their EA rights; and (iv) creating and maintaining working conditions so intolerable that Plaintiffs were constructively discharged on February 2, 2026.

223.    A direct causal connection exists between Plaintiffs' protected activity and the retaliatory actions taken against them, as evidenced by the close temporal proximity between specific instances of protected activity (including Plaintiff Patito's July 2025 conversations regarding compensation and disclosure to E&Y and the Board, and Plaintiff Maxwell's July 2025 communications with CLA) and the retaliatory responses described herein.

224.    As a direct and proximate result of Defendants' retaliation, Plaintiffs have suffered damages in amounts to be proven at trial.

225.    Plaintiffs are not, with this cause of action, seeking damages for breach of the EAs.

226.    Plaintiffs are entitled to all relief necessary to make them whole, including (i) compensation for lost wages, benefits, and other remuneration, including front pay; (ii) payment of reasonable costs, disbursements, and attorneys' fees; (iii) a civil penalty of up to $10,000; and (iv) punitive damages, where the violation was willful, malicious, or wanton.

NINTH CAUSE OF ACTION
Fraudulent Transfer in Violation of New York Debtor and Creditor Law § 273(a)(1)
(Against Defendant DRH)

227.    Plaintiffs repeat and reallege every allegation made in the above paragraphs of this Complaint.

228.    Plaintiffs were creditors within the meaning of New York Debtor and Creditor Law § 273(a), holding binding contractual claims under their EAs that arose in February 2022 and that

matured and became due as specific compensation events occurred (including deal closings generating Non-Discretionary Performance Fees, NAV milestones triggering phantom equity vesting, and compensation accruals). DCL § 273(a) protects creditors whether their claims arose before or after the transfer at issue. Plaintiffs' claims were further established and quantified by their February 2026 formal demand letter, sent weeks before the Grain transaction closed, and by Defendant Prime's own auditor confirming in July 2025 that the compensation plan was "clearly in the money."

229.    Defendant Laag caused Defendant DRH to complete the Grain transaction—a $500 million preferred equity investment in Defendant DRH, the proceeds of which were used to acquire WDCAH's equity interests, which in turn holds an equity interest in Defendant Prime. The transaction transferred Defendant Prime-related equity value and control rights through Defendant DRH while, upon information and belief, leaving Defendant Prime's EA obligations and Plaintiffs' demand unpaid and undisclosed.

230.    Absent a transaction by March 31, 2026, OneIm could have foreclosed on Defendant Laag's equity in Defendant Prime and he would have had to transfer his shares to Macquarie. The Grain transaction was designed to avoid this.

231.    To accomplish the Grain transaction and thereby preserve Defendant Laag's majority ownership in Defendant Prime, Defendant Laag intentionally hindered, delayed, or defrauded Plaintiffs and other creditors' interests.

232.    Upon information and belief, Defendant Prime's EA liabilities were concealed from Grain, even though the transaction closed shortly after Plaintiffs had asserted their claims by formal demand letter.

233. Following the Grain transaction, $500 million flowed to Defendant DRH then to Macquarie and Ares while Plaintiffs received nothing.

234. By virtue of DRH's alter-ego status with Defendant Prime, the Grain transaction is a transfer by Prime for DCL purposes.

235. Defendant DRH is liable as the direct transferee because it received the $500 Million and directly benefited from the Grain transaction.

236. As a result of the fraudulent transfer, Plaintiffs suffered damages, including impairment of their ability to satisfy any judgment entered in this action. Plaintiffs are entitled to avoidance of the Grain transaction, attachment of Defendant DRH's assets, attorneys' fees, and all other appropriate relief.

TENTH CAUSE OF ACTION
Declaratory Judgment of Alter-Ego Status/Joint and Several Liability
(Against Defendant DRH)

237. Plaintiffs repeat and reallege every allegation made in the above paragraphs of this Complaint.

238. There exists between Plaintiffs and DRH an actual, justiciable controversy concerning DRH's status as the alter ego of Defendant Prime and of Defendant Laag, and concerning DRH's joint and several liability with Defendant Prime and Defendant Laag for the relief sought in each of Plaintiffs' substantive causes of action.

239. Defendant Laag's complete domination and control of DRH, the absence of any independent corporate existence on the part of DRH, the commingling of funds and assets among DRH and the other Defendant Laag-controlled entities, the use of DRH to receive and hold value created by Plaintiffs' work, the use of DRH to render Defendant Prime functionally unable to satisfy Plaintiffs' known claims together establish that DRH is the alter ego of Defendant Prime

and of Defendant Laag, and that adherence to the corporate fiction would sanction fraud and injustice.

240. Defendants used Defendant Laag's domination of DRH to perpetrate fraud against Plaintiffs and other creditors of Defendant Prime, and to commit the wrongs alleged herein. Specifically, Defendants used DRH (i) to capture and retain the upside of Plaintiffs' work outside the entity legally obligated to compensate them; and (ii) to receive transferred value while Plaintiffs' known and quantified claims remained unpaid.

241. Plaintiffs accordingly seek a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, declaring that (i) DRH is the alter ego of Defendant Prime and of Defendant Laag; (ii) DRH is jointly and severally liable with Defendant Prime and Defendant Laag on each of Plaintiffs' substantive causes of action; and (iii) any judgment entered against Defendant Prime or Defendant Laag may be enforced against DRH and the assets DRH holds in the same manner as if those assets were held by Defendant Prime or Defendant Laag directly.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs Patito and Maxwell hereby demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs James Maxwell and Joseph Patito respectfully request that this Court enter judgment in their favor and against Defendants, and grant the following relief:

a. Compensatory damages at least in the amount of $189.6 million (Plaintiff Patito) and $66.4 million (Plaintiff Maxwell), totaling at least $256 million, plus pre-judgment interest at the applicable legal rate, representing unpaid Non-Discretionary Performance Fees, phantom

equity under Exhibit C, Employee Co-Invest Rights, and all other compensation owed under Plaintiffs' EAs;

b.      Treble damages pursuant to 18 U.S.C. § 1964(c)-(d) on account of Defendants' civil RICO violations;

c.      Punitive damages on account of Defendants' intentional and malicious conduct;

d.      Attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c) and as otherwise permitted by law;

e.      Injunctive and declaratory relief, including a declaration that Plaintiffs' original EAs and Exhibit C Incentive Plans remain binding and enforceable in full;

f.      Avoidance of the Grain Management transaction and attachment of Defendant DRH's assets to satisfy any judgment entered in favor of Plaintiffs, pursuant to New York Debtor and Creditor Law § 273(a)(1);

g.      Such other and further relief as the Court deems just and proper.


Dated: New York, New York
       May 28, 2026

                                        LIPSKY LOWE LLP

                                        /s/ Douglas B. Lipsky
                                        Douglas B. Lipsky
                                        Travis Pierre-Louis
                                        Blake L. Ferris
                                        420 Lexington Avenue, Suite 1830
                                        New York, New York 10170-1830
                                        212.392.4772
                                        doug@lipskylowe.com
                                        travis@lipskylowe.com
                                        blake@lipskylowe.com
                                        *Attorneys for Plaintiffs James Maxwell and Joseph Patito*