# EXHIBIT 1

**EMPLOYMENT AGREEMENT**

This Employment Agreement ("*Agreement*") is entered into by and between Prime Data Centers LLC, a Delaware limited liability company (the "*Company*"), and Jake Maxwell, an individual ("*Employee*"), as of **February 22, 2022**, the "*Effective Date*").

**RECITALS**

The Company is in the business of the development and operation of data center facilities in the United States of America (the "*Company Business*").  EMPLOYEE has many years of experience relating to the Company Business and possesses valuable skills and experience that will be used in advancing the Company Business.  EMPLOYEE is willing to be engaged by the Company, and the Company is willing to engage EMPLOYEE, as an employee of the Company, upon the terms and conditions set forth in this Agreement.  Employee will be a key employee of the Company, with significant access to trade secrets and other confidential information concerning the Company, its affiliates, and their respective businesses and clients, such that the disclosure or misuse of such information by Employee would cause substantial harm to the Company and its affiliates.

**AGREEMENT**

In consideration of the above premises, the mutual agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Company and the EMPLOYEE hereby agree as follows:

**ARTICLE 1**
**SERVICES**

1.1    General Services.

(a)    The Company engages EMPLOYEE as Senior Associate Investment Team of the Company.  EMPLOYEE is a full-time, exempt employee under the federal Fair Labor Standards Act and applicable state law, and will perform the duties and services set forth on Exhibit A, attached (collectively, the "*Services*").  The Company may request that EMPLOYEE perform the Services pursuant to this Agreement to and for the benefit of not only the Company but also one or more subsidiaries or affiliates of the Company or any person controlling or under common control with the Company (each, a "*Company Affiliate*").  EMPLOYEE will accept and perform the Services in each engagement by a Company Affiliate pursuant to the terms of this Agreement and any additional terms as agreed to by and between EMPLOYEE and the Company.

(b)    EMPLOYEE will report to and be under the direction of Investment Team – Chris Sumter, Hoch Cho and Joseph Patito.

1.2    Location.  EMPLOYEE will be based in and will render services for the Company at the Company's offices New York or such other replacement or additional offices located in San Francisco / Dallas.  EMPLOYEE hereby acknowledges that the Company expects to conduct some of the Services in various locations outside of New York.  Therefore, EMPLOYEE will be asked to, and EMPLOYEE hereby agrees to, undertake as much travel as is in the best interest of the Company to the extent necessary, reasonable, or advisable for the effective performance of the Services.

1.3    Full Time; Best Abilities.  EMPLOYEE will devote Employee's full time, attention, efforts, and best abilities to perform the Services.  EMPLOYEE will act at all times according to what

EMPLOYEE reasonably believes to be in the best interests of the Company.  Employee shall not engage in any other activity that could reasonably be expected to interfere with the performance of the Services and Employee's duties and responsibilities under this Agreement.

1.4    Compliance.  EMPLOYEE, in EMPLOYEE's capacity as an employee of the Company, will comply with all laws and regulations applicable to EMPLOYEE as a result of this Agreement. EMPLOYEE will also comply with any and all policies and procedures of the Company adopted and revised from time to time by the Board of Managers of the Company ("*Board*") and those of Company Affiliates to which EMPLOYEE may provide the Services, including without limitation any and all employment policies and procedures of the Company as adopted and revised from time to time by the Board, as well as practices now in effect or as later amended or adopted by the Company.

**ARTICLE 2**
**TERM**

EMPLOYEE's employment with the Company under this Agreement will commence on the Effective Date and continue until terminated pursuant to Section 4.1 or by law.  The duration of EMPLOYEE's employment with the Company will be referred to herein as the "*Term*."

**ARTICLE 3**
**COMPENSATION AND BENEFITS**

3.1    Compensation.  EMPLOYEE's total compensation under this Agreement consists of only the compensation set forth in Exhibit B, attached.  Any compensation paid to EMPLOYEE will be pursuant to the Company's policies and practices and will be subject to all applicable laws and requirements regarding the withholding of federal, state and/or local taxes.  Compensation is paid upon the terms and subject to the conditions set forth herein, including the condition that EMPLOYEE is substantially performing the Services, EMPLOYEE is not in material breach of this Agreement, and grounds do not then exist for the termination of this Agreement for Cause as provided in Section 4.1(d) below.  Compensation provided in Exhibit B attached hereto is full payment for the Services, and EMPLOYEE will receive no additional compensation for extraordinary services unless otherwise authorized by the Board.

3.2    Business Expenses.  The Company will reimburse EMPLOYEE for documented business expenses reasonably and necessarily incurred in performing the Services in accordance with the Company's policies and procedures then in effect, *provided*, EMPLOYEE must obtain the prior written approval of the Chief Executive Officer of the Company before incurring any single expense or series of related expenses in the aggregate in excess of $5,000 per month unless any such expense incurred by EMPLOYEE and reimbursement of such expense by the Company are set forth in any budget  approved  by the Board.

3.3    Incentive Plan. EMPLOYEE shall be eligible to participate in the Incentive Plan attached hereto as Exhibit C, and shall be subject to all of the terms and conditions set forth therein immediately upon execution.

3.4    Benefits.  Without duplication of any benefits set forth in Exhibit B, Employee will be entitled to those employee benefits adopted by the Company for all employees of the Company from time to time.  All benefits are subject to eligibility requirements applicable to each benefit, and are subject to modification or elimination at any time, in the sole and absolute discretion of the Company.

3.5    Vacation.  EMPLOYEE will accrue paid vacation equal to three weeks vacation per year. The time or times for any vacation to be taken by EMPLOYEE will be proposed by EMPLOYEE and approved by, or in accordance with policies established by, the Board from time to time.

**ARTICLE 4**
**TERMINATION**

4.1    <u>Circumstances of Termination</u>.  This Agreement and the employment relationship between the Company and EMPLOYEE may be terminated in accordance with the provisions of this Section 4.1. Termination of employment of EMPLOYEE by the Company in accordance with this Section 4.1 will also terminate any employment by or compensation payment from any Company Affiliate, unless otherwise approved in writing by the Board:

(a)    <u>Death</u>.  EMPLOYEE's employment with the Company under this Agreement will terminate upon EMPLOYEE's death, effective as of the date of EMPLOYEE's death.

(b)    <u>Disability</u>.  The Company may, at its option, either suspend compensation payments or terminate EMPLOYEE's employment with the Company under this Agreement if Employee is unable, due to physical or mental illness or injury, as determined in good faith by the Board, to perform one or more essential functions of Employee's position, with or without reasonable accommodation, for a total period of 21 days, regardless of whether the days are consecutive ("*Disability*").  If the Company suspends compensation payments (instead of terminating this Agreement) because of EMPLOYEE's Disability, the Company will resume compensation payments when EMPLOYEE resumes full and uninterrupted performance of the Services.  Notwithstanding the preceding sentence, the Company may, in its sole and absolute discretion, terminate EMPLOYEE's employment by the Company under this Agreement due to EMPLOYEE's Disability, by written notice to EMPLOYEE.  Nothing in this section shall be construed to deny EMPLOYEE the right to reasonable accommodation under applicable law in the event of disability

(c)    <u>Discontinuance of Business</u>.  If the Company (or any successor) discontinues operating all or substantially all of the Company Business, EMPLOYEE's employment with the Company (or successor) under this Agreement will terminate as of the final date of the discontinuance with the same effect as if that date was originally established as the date of termination or expiration of the Term.

(d)    <u>Cause</u>.  The Company may terminate this Agreement at any time for Cause, by written notice to EMPLOYEE.  For the purpose of this Agreement, "*Cause*" means (i) any failure by EMPLOYEE to comply in any material respect with the terms and conditions of this Agreement or the Confidentiality, Trade Secret and Fair Competition Agreement, which failure is not cured (if curable) by EMPLOYEE within a Reasonable Period (as defined below); (ii) any action (or failure to act) by EMPLOYEE that causes the Company or any Company Affiliate to be in breach in any material respect of its obligations under any agreement to which the Company or the Company Affiliate is party (unless the action is taken by EMPLOYEE in good faith reasonable belief that the action is in the best interest of the Company or the Company Affiliate or the action was approved by the Board); (iii) any willful misappropriation of the Company's funds or property or material misuse of the Company's assets by EMPLOYEE; (iv) EMPLOYEE's indictment, charge by any government authority that is not dismissed within 30 days, or conviction in a court of law of, or entry of a plea of guilty or nolo contendere to, a crime involving a felony, theft, fraud, or moral turpitude; (v) (A) use of illegal drugs or other illegal substances or (B) abuse of alcohol by EMPLOYEE that materially interferes with the performance of the Services (Company may, in its sole discretion, provide EMPLOYEE an opportunity to cure after one written warning and a grace period of 10 days following the warning); (vi) EMPLOYEE's  gross dereliction or gross negligence in performing the Services; (vii) EMPLOYEE's repeated or flagrant failure or refusal to use good-faith efforts to abide by a lawful and reasonable directive of the Board related to the Services; (viii) EMPLOYEE's violation of any policies of the Company relating to discrimination, harassment, or retaliation,  or (ix) conduct that causes substantial harm to the business or reputation or future business operations of the Company or any Company Affiliate.  For purposes of this section, a drug or substance is

3

"illegal" if EMPLOYEE's use of such drug or substance is prohibited by federal, state or local law, regardless of whether such conduct constitutes an illegal act or whether the employee is or could be criminally prosecuted and/or convicted for the conduct.  The Company's exercise of its right to terminate this Agreement will be without prejudice to any other remedy to which the Company may be entitled at law, in equity, or under this Agreement.

(e)     Without Cause.  The Company may terminate EMPLOYEE's employment with the Company under this Agreement without Cause at any time upon 30 days advance written notice to EMPLOYEE.

(f)     Termination by EMPLOYEE.  EMPLOYEE may terminate EMPLOYEE's employment with the Company under this Agreement at any time with 30 days advance written notice to the Company, *provided*, that EMPLOYEE may not terminate EMPLOYEE's employment with the Company under this Agreement if grounds then exist for the termination of EMPLOYEE's employment by the Company for Cause.

As used herein, "***Reasonable Period***" means, with respect to any breaching party, a period of 7 calendar days after the breaching party receives written notice of breach from the non-breaching party.

4.2     EMPLOYEE's Rights upon Termination.  The date of the termination of EMPLOYEE's employment with Company for any reason will be the "***Termination Date***" for purposes of this Agreement.  Upon termination of EMPLOYEE's employment with the Company under this Agreement, the Company will have no further obligation to EMPLOYEE under this Agreement, except to pay to EMPLOYEE (or EMPLOYEE's estate or designated beneficiary) the following (less withholdings and through payroll, as may be applicable):

- payment of accrued but unpaid Base Salary (as defined in Exhibit B) through the Termination Date;

- payment of accrued, earned but unpaid Commissions (as defined in Exhibit B) through the Termination Date;

- reimbursement of any unpaid reimbursable expenses outstanding as of the Termination Date;

- a lump-sum payment in respect of accrued but unused vacation days;

- all benefits, if any, that had valid and fully accrued and vested to EMPLOYEE through the Termination Date under the plans and programs described in Sections 3.3 and 3.4, or any other applicable plans and programs in which EMPLOYEE participated as an employee of the Company, in the manner and in accordance with the terms of such plans and programs.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES

5.1     Representations of EMPLOYEE.  EMPLOYEE represents and warrants that EMPLOYEE has all right, power, authority and capacity, and is free to enter into this Agreement; that by doing so, EMPLOYEE will not violate or interfere with the rights of any other person or entity; and that EMPLOYEE is not subject to any contract, understanding, or obligation that will or might prevent, interfere with, or impair the performance of this Agreement by EMPLOYEE.  EMPLOYEE will indemnify and hold the

Company harmless with respect to any losses, liabilities, demands, claims, fees, expenses, damages, and costs (including attorneys' fees and court costs) resulting from or arising out of any claim or action based on this representation.

5.2     Representations of the Company.  The Company represents and warrants that it has all right, power, and authority, without the consent of any other person, to execute and deliver, and perform its obligations under, this Agreement.  All company organizational and other actions required to be taken by the Company to authorize the execution, delivery and performance of this Agreement and the consummation of all transactions contemplated hereby have been duly and properly taken.  This Agreement is the lawful, valid and legally binding obligation of the Company enforceable in accordance with its terms.

5.3     Materiality of Representations.   The parties hereto acknowledge and agree that each representation, warranty, and covenant set forth in this Agreement is material and has been relied upon by each other party.

## ARTICLE 6
### COVENANTS

6.1     Protection of Confidential and Proprietary Information.  EMPLOYEE acknowledges that, as a result of performing the Services, EMPLOYEE will have access to confidential, proprietary, and/or sensitive information concerning the business of the Company and the Company Affiliates.  EMPLOYEE also acknowledges that in the course of performing the Services, EMPLOYEE may make, author, develop, create, or otherwise reduce to practice products, ideas, information, content, data, trade secrets, know-how, works of authorship, derivative works, inventions, techniques, designs, systems, methods, developments, modifications, improvements, or other protectable proprietary information or technology (collectively, whether or not the foregoing are patentable or copyrightable, published or unpublished, the "*Inventions*").  To ensure the protection of the Company's Confidential Information (as defined in Exhibit D) and Inventions, EMPLOYEE agrees that, as a condition of employment, EMPLOYEE must execute and abide by the Confidentiality, Trade Secrets and Fair Competition Agreement (as set forth in Exhibit D).  EMPLOYEE's obligations under ARTICLE 6 survive the expiration or termination of this Agreement.

6.2     Covenant to Deliver Records and Company Property.  All memoranda, notes, records, electronic data and other documents, materials, or equipment made available to EMPLOYEE or developed by EMPLOYEE prior or during the Term concerning of for the Company Business will be and remain the property of the Company and all property of the Company in the possession of EMPLOYEE will be delivered to the Company upon the termination of this Agreement or at any other time on request of the Company.  EMPLOYEE agrees that the Company will be entitled to injunctive relief, as well as monetary damages, in connection with any misappropriation or disclosure of the Confidential Information by EMPLOYEE, as well as any other remedies available to protect the non-disclosure or use by EMPLOYEE for direct or indirect personal profit of the Confidential Information.

6.3     Non-disparagement.  EMPLOYEE will at any time (and will cause his or her affiliates or any other person or entity acting at his or her direction or in concert with the Party to not) disclose to the public or any other person or entity any false or misleading negative information concerning the Company Business, the Company, any Company Affiliate, or any past or present employees, directors, managers, officers, members or agents of any of the same.  EMPLOYEE will not take any action adversely affecting the Company, the Company Affiliates or the Company Business, except EMPLOYEE or his or her agents may, after providing prompt written notice thereof to the Company, disclose negative (but not false or misleading) information to the extent necessary in order to comply with any law, order, regulation or ruling applicable to the Company, the Company Affiliates or the Company Business.

**ARTICLE 7**
**CERTAIN RIGHTS OF THE COMPANY**

7.1    <u>Announcement</u>.    EMPLOYEE shall not have the right to make public announcements concerning the execution of this Agreement without the Company's prior written consent.

7.2    <u>Use of Name, Likeness and Biography</u>.    The Company will have the right (but not the obligation) to use, publish and broadcast, and to authorize others to do so, the name, approved likeness and approved biographical material of EMPLOYEE to advertise, publicize, and promote the Company Business, but not for the purposes of direct endorsement without EMPLOYEE's prior written consent.    An "approved likeness" and "approved biographical material" will be, respectively, any photograph or other depiction of EMPLOYEE or any biographical information or life story concerning the professional career of EMPLOYEE previously approved by EMPLOYEE in writing or provided by EMPLOYEE in writing to the Company.

7.3    <u>Right to Insure</u>.    The Company will have the right to secure, in its own name or otherwise, and at its own expense, life (up to $1,000,000), health, accident or other insurance covering EMPLOYEE, and EMPLOYEE will have no right, title or interest in and to the insurance.    EMPLOYEE will assist the Company in procuring the insurance by submitting to examinations and by signing any applications and other instruments as may be required by the insurance carriers to which application is made for any insurance.

**ARTICLE 8**
**ASSIGNMENT**

Neither party may assign or otherwise dispose of its rights nor obligations under this Agreement without the prior written consent of the other party except as provided in this ARTICLE 8.    The Company may assign and transfer this Agreement, or its interest in this Agreement, to any Company Affiliate or to any entity that is a party to a merger, reorganization, or consolidation with the Company, or to a subsidiary of the Company, or to any entity that acquires substantially all of the assets of the Company or any Company Affiliate with respect to which EMPLOYEE is providing services (providing the assignee assumes the Company's obligations under this Agreement).    EMPLOYEE will, if requested by the Company, perform EMPLOYEE's duties and the Services, as specified in this Agreement, for the benefit of any Company Affiliate.    Upon assignment, acquisition, merger, consolidation, or reorganization, the term "Company" as used herein will be deemed to refer to the assignee or successor entity.    This Agreement is personal in nature with respect to EMPLOYEE, and therefore EMPLOYEE will not have the right to assign EMPLOYEE's interest in this Agreement, any rights under this Agreement, or any duties imposed under this Agreement, nor will EMPLOYEE or EMPLOYEE's spouse, heirs, beneficiaries, executors or administrators have the right to pledge, hypothecate or otherwise encumber EMPLOYEE's right to receive compensation hereunder without the express written consent of the Company.

**ARTICLE 9**
**IRC SECTION 409A COMPLIANCE**

This Agreement is intended to be either (i) in compliance with the requirements of Section 409A of the Internal Revenue Code, as amended, and the Treasury regulations and guidance issued thereunder ("**_Section 409A_**"), to the extent that it is applicable to this Agreement or (ii) exempt from the requirements of Section 409A to the extent provided thereunder (e.g., by reason of being an involuntary separation pay plan that does not result in the deferral of compensation pursuant to Treasury regulations section 1.409A-1(b)(9)(iii) or by reason of being a short-term deferral within the meaning of Treasury regulations section 1.409A-1(b)(4)).    All provisions of this Agreement shall be interpreted in a manner consistent with

6

compliance with Section 409A to the extent it is applicable to this Agreement or preserving any applicable exemption from the requirements of 409A. "Termination" or such similar terms, when used in reference to termination of employment, shall be interpreted to mean a "separation from services" as defined by Section 409A. To the extent that any provision in this Agreement is ambiguous as to its compliance with Section 409A, or to the extent any provision in this Agreement must be modified to comply with Section 409A, such provision shall be read, or shall be modified (with the mutual consent of the Parties), as the case may be, in such a manner so that no payment due to EMPLOYEE shall be subject to an "additional tax" within the meaning of Section 409A(a)(1)(B). Notwithstanding the foregoing, the Company makes no representations that any or all of the payments and benefits provided under this Agreement will be exempt from or comply with Section 409A, and in no event shall the Company be liable for all or any portion of any taxes, penalties, interest, or other expenses that may be incurred by EMPLOYEE on account of non-compliance with Section 409A.

Notwithstanding any other provision of this Agreement, if EMPLOYEE is a "specified employee" as defined in Section 409A, then any amounts subject to Section 409A that are otherwise required to be paid to EMPLOYEE upon separation from service (as defined in the Section 409A) shall not be paid until the first payroll date following the date that is six (6) months after the date of separation from service or, if earlier, the date of EMPLOYEE's death. To the extent that this Agreement provides for the reimbursement of specified expenses incurred, such reimbursement will be made in accordance with the provisions of this Agreement (or other applicable plan or policy), but in no event later than the last day of the taxable year following the taxable year in which the expense was incurred. The amount of expenses eligible for reimbursement or in-kind benefits provided by the Company in any taxable year will not affect the amount of expenses or in-kind benefits to be reimbursed or provided in any other taxable year, and any right to reimbursements or in-kind benefits under this Agreement shall not be subject to liquidation or exchange for another benefit.

## ARTICLE 10
## GENERAL PROVISIONS

10.1    Notices. Any and all notices, demands or other communications will be in writing and will be served personally, by a national courier service guaranteeing next business day delivery, by electronic mail or by U.S. regular mail. If served by electronic mail or courier service, service conclusively will be deemed made one business day after the electronic transmission or the notice is delivered to the courier service. If served personally, service conclusively will be deemed made on the date of service. If served by U.S. regular mail as aforesaid, service conclusively will be deemed made on the fourth business day after mailing.

10.2    Amendment and Waiver. Any provision of this Agreement may be amended or modified and the observance of any provision may be waived (either retroactively or prospectively) only by written consent of the parties. Either party's failure to enforce any provision of this Agreement will not be construed as a waiver of that party's right to enforce such provision. No waiver by any party of any condition, or breach of any provision, term, covenant, representation or warranty contained in this Agreement, whether by conduct or otherwise, in any one or more instances, will be deemed to be or construed as a further or continuing waiver of any such condition.

10.3    Governing Law. This Agreement and the performance under this agreement will be interpreted under the substantive laws of the State of New York without regard to conflict of laws rules.

10.4    Forum. Each party hereby irrevocably submits generally and unconditionally for itself and in respect of its property to the jurisdiction the Superior Court of New York, Southern US District Court for New York, and each of the parties hereto consents to the exclusive jurisdiction of such courts in any

7

such proceeding. Each party hereby irrevocably waives, to the fullest extent permitted by law, any objection that such party may now or hereafter have to the laying of venue in any such court and any claim that any such court is an inconvenient forum.

10.5    Attorneys' Fees. If any suit is brought by any party hereto to enforce the terms of this Agreement, the prevailing party will be entitled to the payment of its reasonable attorneys' fees and costs, as determined by the judge of the court.

10.6    Force Majeure. Either party will be temporarily excused from performing under this Agreement if any force majeure or other occurrence beyond the reasonable control of either party makes the performance impossible, except a Disability as defined in this Agreement; *provided*, that the party subject to the force majeure provides notice of such force majeure at the first reasonable opportunity. Under such circumstances, performance under this Agreement that related to the delay will be suspended for the duration of the delay provided the delayed party will resume performance of its obligations with due diligence once the delaying event subsides. In case of any such suspension, the parties will use their best efforts to overcome the cause and effect of such suspension.

10.7    Remedies. EMPLOYEE acknowledges that because of the nature of the Company's business, and the fact that the services to be performed by EMPLOYEE pursuant to this Agreement are of a special, unique, unusual, extraordinary, and intellectual character that give them a peculiar value, a breach of this Agreement will cause substantial injury to the Company for which money damages cannot reasonably be ascertained and for which money damages would be inadequate. EMPLOYEE therefore agrees that the Company will have the right to obtain injunctive relief, including the right to have the provisions of this Agreement specifically enforced by any court having equity jurisdiction, in addition to any other remedies that the Company may have.

10.8    Severability. If any term, provision, covenant, paragraph, or condition of this Agreement is held to be invalid, illegal, or unenforceable by any court of competent jurisdiction, that provision will be limited or eliminated to the minimum extent necessary so this Agreement will otherwise remain enforceable in full force and effect.

10.9    Construction. Headings and captions are only for convenience and will not affect the construction or interpretation of this Agreement. Whenever the context requires, words used in the singular will be construed to include the plural and vice versa, and pronouns of any gender will be deemed to include the masculine, feminine, or neuter gender. Whenever the words "including", "include" or "includes" are used in this Agreement, they should be interpreted in a non-exclusive manner as though the words ", without limitation," immediately followed the same. Whenever the word "or" is used in this Agreement, it shall be interpreted as non-exclusive in the same manner as "and/or." Unless otherwise specified in this Agreement, all subsection and section references in this Agreement refer to subsections and sections of this Agreement.

10.10    Counterpart Copies. This Agreement may be signed in counterpart copies, each of which will represent an original document, and all of which will constitute a single document. A signature received via facsimile or electronically via email shall be as legally binding for all purposes as an original signature.

10.11    No Adverse Construction. The rule that a contract is to be construed against the party drafting the contract is hereby waived, and will have no applicability in construing this Agreement or the terms hereof.

10.12    Entire Agreement. With respect to its subject matter, namely, the engagement by the Company of EMPLOYEE, this Agreement (including exhibits attached hereto and the documents expressly

8

incorporated herein and therein), contains the entire understanding between the parties, and supersedes any prior agreements, understandings, and communications between the parties, whether oral, written, implied or otherwise.

10.13    <u>Assistance of Counsel</u>.  EMPLOYEE expressly acknowledges that EMPLOYEE has been given an opportunity to be represented by counsel of EMPLOYEE's own choosing in connection with the negotiation and drafting of the terms of this Agreement prior to his execution and delivery of this Agreement.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereby execute this Employment Agreement as of the date first set forth above.

"**Company**"

Prime Data Centers LLC
a Delaware limited liability company

By: _____
        Nicholas Laag

"**EMPLOYEE**"

By:_____
        Jake Maxwell

**EXHIBIT A**
**TO THE EMPLOYMENT AGREEMENT**

**SERVICES**

Associate - Asset Management Platform & Acquisitions – Analytics, Asset Management, Underwriting, Risk Assessment, Platform Growth, Deal Origination and Strategy:

- Employee will work closely with the investment team on sourcing, due diligence and executing investment opportunities.

- Conduct market research on companies, industries, and asset classes, supporting the sector

- Maintain active coverage of assigned sub-sector and thematic areas of focus

- Perform all pertinent financial analyses, including discounted cash flow, comparables, and precedent transactions

- Prepare due diligence packs for the investment team, providing relevant, informative analytics and background research

- Prepare written summaries and presentation materials for the investment team

- Build detailed operating models on prospective deals

- Draft information memorandum and marketing materials for the investment team

- Assist investment team and train analyst in oversight of our underwriting process including but not limited to business plan, risk analysis, investment process from deal origination to asset management (execution of business plans, reporting, semi-annual re-underwriting, exits), performance metrics.

11

**EXHIBIT B**
**TO THE EMPLOYMENT AGREEMENT**

**COMPENSATION**

**Base Salary:**

1) $192,000 per year paid in equal semi-monthly installments or otherwise in accordance with the Company's normal payroll practices and subject to all applicable taxes and withholding as required by law.

2) Increase based on milestone – reviewed and updated January of following year from employment start:

$240,000 per year (equivalent to $20,000 per month) and paid out twice per months, once Company has $20mm annualized recurring revenues and >$10mm EBITDA from rental income and asset / property management fees at end of any financial year.

**Performance Based Compensation:**

1) **Discretionary Bonus:**

EMPLOYEE is eligible to earn a discretionary annual bonus pursuant to the Company's policy or bonus plan as such plan or policy may be in effect from time to time.  As of the Effective Date, the Company's bonus policy is to allocate at least 10% of the "Funds from Operation" (net after tax profit and depreciation) to a bonus pool that will be distributed to all Company employees eligible to earn an annual bonus.  The amount of EMPLOYEE's annual bonus, if any, is determined in the sole discretion of the Board of Directors may amount to between 0% - 200% of the Base Salary.

To be eligible to receive an annual bonus, EMPLOYEE must be employed by the Company on January 31st of every year.

2) **Non-Discretionary Bonus:**

i. Non-Discretionary Joint Ventures – deal by deal economics:

Initialy 1.0-1.5% of the carried interest (performance fee) on all deals Company closes as well as (2225 Martin that we closed in December 2021). In event EMPLOYEE originates and executes a transaction, the EMPLOYEE could attain 1.0% additional carried interest. Annual review for increase or decrease of carried interest on deal by deal basis. All carried interest subject to vesting period over 4 years or exit if earlier. EMPLOYEE shall co-invest 25% of EMPLOYEES pro-rata share of Company's co-investment. For example Company has 10% ownership in a joint venture with total  equity commitments of $50m, EMPLOYEE would co-invest along Company, for example 2% of 10% = 0.2% x 25% = $25K.  On a case by case basis, as determined in the sole discretion of the Board of Directors, EMPLOYEE may be allowed to increase disproportionately.

ii.    Discretionary Fund – Fund Level Economics:

- Company is targeting to raise minimum $200 million equity fund in 2022.
- EMPLOYEE may initially 1.0% share of the carried interest with the same co-investment obligatyions as noted in (2) (i) abovce and where the share of the carried interest can increase up to 4.0% subject to performance over the investment period of the fund.

13

**EXHIBIT C**
**TO THE EMPLOYMENT AGREEMENT**

**INCENTIVE PLAN**

*[Will be implemented and added before end of Q2 2022]*

EMPLOYE prelmimary Ownership Incentive Program through Phantom Share program:

1)  Upfront grant equivalent to 0.10% of Company today and amounting to 900 units. The fixed 0.10% will vest over 5 years at 1/5th per year and where the vesting period will start 6 months after start of Employment.

2)  Milestone Options derived from the Net Asset Value (NAV) of Company, where Employee is eligible for of up to 0.50% equivlant to 4,500 units based on current total membership count (each unit is equivalent to 1 share equivalent) and where minimum 15% of the cash flows and estimated value is derived from the AM Platfrom. Anything below adjusted pro-rata. Milestone options are calculated and granted annually before April 1 of every year. See below table as an example:

| Milestone Options | | | | | | | ($'000) |
|---|---|---|---|---|---|---|---|
| Total NAV Milestone | Est. Pro-Rata Owned MW | Ownership Granted % | Granted Options | Est New Units Cap. Increase | Est Funding Cap Increase | Est. FD Ownership | Est. Accumulated Implied Value |
| Fixed Portion | N/A | 0.100% | 900 | 0 | 0 | 0.10% | 300 |
| 300,000 | 38.6 | 0.050% | 450 | 0 | 0 | 0.15% | 450 |
| 450,000 | 57.9 | 0.050% | 450 | 439,286 | 30,000 | 0.13% | 605 |
| 600,000 | 77.2 | 0.050% | 450 | 66,964 | 30,000 | 0.16% | 960 |
| 750,000 | 96.5 | 0.050% | 450 | 56,250 | 30,000 | 0.18% | 1,385 |
| 900,000 | 115.7 | 0.050% | 450 | 48,750 | 30,000 | 0.21% | 1,876 |
| 1,100,000 | 141.5 | 0.050% | 450 | 54,955 | 40,000 | 0.23% | 2,528 |
| 1,300,000 | 167.2 | 0.050% | 450 | 48,191 | 40,000 | 0.25% | 3,261 |
| 1,500,000 | 192.9 | 0.050% | 450 | 43,051 | 40,000 | 0.27% | 4,073 |
| Employee | 192.9 | 0.500% | 4,500 | 757,446 | 240,000 | 0.27% | 4,073 |
| Total Prime Owned | 192.9 | 100.00% | 900,000 | 1,657,446 | | | 1,500,000 |

*Note: Table is for illustrative purposes only and not providing for exact calculations of F.D. ownership*

The pro-rata NAV for the Milestone Options are based on Companies' consolidated pro-forma value of assets that it controls through majority ownership or minority ownership based on equity method. The yearly NAV number shall include and accumulate on a pro-rata basis all retained earnings and capital gains from sales of assets and or shares in all Prime related entities as if no dividends or distributions have been paid out from normal course of business. In other words, all dividends or distributions, in cash or in kind, shall be added back to calculate the total trailing and updated NAV.

14

The current basis, for this exemplary table and calculations, amounts to 900,000 units from which to calculate the percentage ownership and is subject to dilution based on post money Macquarie transaction and further capital increase.

**EXHIBIT D**
**TO THE EMPLOYMENT AGREEMENT**

**FORM OF CONFIDENTIALITY, TRADE SECRETS AND FAIR COMPETITION AGREEMENT**

Jake Maxwell ("***Employee***") is about to become a paid employee of Prime Data Centers, LLC, a Delaware limited liability company (the "***Company***"), pursuant to that certain Employment Agreement with an effective date of February 22$^n$, 2022 entered into by and between Employee and the Company (the "***Employment Agreement***"). Capitalized terms not otherwise defined below have the meanings set forth in the Employment Agreement.

In consideration of Employee's employment and the compensation paid to Employee by the Company, the sufficiency of which is acknowledged by Employee, Employee hereby acknowledges and agrees with the Company as follows:

1.        Protection of Company's Confidential Information.

(a)        Confidential Information.  The Company and the Company Affiliates (each, a "***Company Party***" and collectively, the "***Company Parties***") have and will develop, compile and continue to possess certain non-public Trade Secrets (as defined herein), data, know-how, and other information ("***Confidential Information***").   The Company Parties have and will also have access to Confidential Information of their respective Customers.  ("***Customers***" shall mean any persons or entities for whom the Company Party performs services or sells products, or from whom a Company Party or Employee obtain information for the purpose of potentially or actually providing products or services to the person or entity.) Confidential Information includes not only information disclosed by the Company Parties or their Customers to Employee in the course of his or her interviews and employment with the Company Parties, but also information developed or learned by Employee during the course of his or her interviews and employment with the Company Parties.

(i)        Confidential Information includes all information that is not generally known to the public and has or could have commercial value or other utility in the business in which the Company Parties or their respective Customers are engaged or in which they contemplate engaging.  Confidential Information also includes all information, the unauthorized disclosure of which could be detrimental to the interests of the Company Parties or their Customers, whether or not such information is identified as Confidential Information by the Company Parties or their Customers.  By example, not limitation, Confidential Information includes all information concerning: Customer data, including but not limited to Customer lists, applicant data, employment categories, job classifications, employment histories, job analyses and validations, preferences, credit history, agreements, contracts, and any personally identifiable information related to Customers, or Customer's employees, customers or clients, including names, addresses, phone numbers, and social security numbers; any non-public information provided to Employee by a Customer, including but not limited to electronic information, documents, and software; historical sales information; advertising and marketing materials and strategies; financial information related to the Company Parties, Customers, Customer's employees or any other party; research and development strategies and results, including new materials research; pending projects and proposals; production processes; proprietary recruiting processes; scientific or technological data, formulae and prototypes; employee and independent contractor personnel data, including names, locations, and compensation; pricing and service information; cost data; computer data information; supplier or vendor information and data; testing techniques; processes; formulas; inventions; discoveries; improvements; specifications; data, know-how, and formats; marketing plans; market share data; contract information; business plans; transactions; negotiations; computer processes; computer programs and codes, including proprietary software applications and platforms developed by or for the Company Parties; technological data; biological materials; engineering designs or drawings; strategies; forecasts; non-public financial data, including costs related to the Company Parties' products or services; budgets; and projections.

16

Nothing stated in this Section 1 or elsewhere within this Agreement is intended to limit or restrict, or shall limit or restrict the Employee's rights under applicable law, including the right to engage in protected activity, such as "whistleblower" activity, or protected activity under the National Labor Relations Act, including discussing wages, hours, or other terms and conditions of Employee's Employment. Employee acknowledges and agrees that unauthorized disclosure of the Company Parties' Trade Secrets, as defined herein, is not and shall not be regarded as protected activity, except as specifically provided in Section 4 herein or other protected "whistleblower" activity as determined by a court of competent jurisdiction.

(ii)    Confidential Information shall not include data or information that (a) has been disclosed voluntarily to the public by the Company, except where such public disclosure has been made by Employee or any Company, agent or employee without the Company's authorization, (b) has been independently developed and publicly disclosed by others, or (c) has otherwise entered the public domain through lawful means.

(b)    Protection of Confidential Information. Employee agrees that at all times during or after his or her employment ends for any reason, Employee will not reproduce, publish, disclose, use, reveal, show, or otherwise communicate to any person or entity any Confidential Information unless specifically authorized in writing by the [President] of the Company to do so. Employee shall not disclose or cause to be disclosed in any way, any Confidential Information to any competitor or unauthorized party, which disclosure Employee acknowledges is a material breach of this Agreement and may constitute unfair competition.

(c)    Employee certifies that the attached **Schedule D-1** is complete and accurate.

2.    Trade Secret Protection Non-Disclosure and Non-Solicitation Covenants. Employee shall not at any time, directly or indirectly use Company Party Trade Secrets to solicit the sale of any products or services that are competitive with products or services offered by, provided by or distributed by the Company Parties, to any Customer or potential Customer of the Company Parties. As used herein, "Trade Secrets" means trade secrets as defined under applicable New York Law, or other section number if renumbered after execution of this Agreement, the federal Defend Trade Secrets Act, and case law interpreting and applying these statutory definitions of "trade secret." By way of example and not limitation, examples of Trade Secrets shall include information which otherwise meets the definition of trade secret as set forth in this Section 2 and is information comprising a recipe, formula, pattern, compilation, program, device, method, technique, process or one or more of the information types described as Confidential Information in Section 1(a)(i) herein. The Company Parties' Trade Secrets shall not lose their status as trade secrets or otherwise be considered generally known to the public if Employee either directly or indirectly, including through other persons, reveals such information to the public without the express written consent of the [President] of the Company. Except for the purpose of performing Services for the Company Parties or with express advance written authorization in each instance from the [President] of the Company to do so, other than as provided by Sections 1 and 4 herein, Employee shall not at any time, directly or indirectly use or disclose the Company Parties' Trade Secrets.

3.    Notice of Immunity Under the Defend Trade Secrets Act. Employee acknowledges and agrees that the Company has provided Employee with written notice below that the Defend Trade Secrets Act, 18 U.S.C. § 1833(b), provides an immunity for the disclosure of a trade secret to report a suspected violation of law and/or in an anti-retaliation lawsuit, as follows:

(a)    An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; *and* (ii) solely for the purpose of reporting or investigating a suspected violation of law; or

(b)    Is made in a complaint or other document filed in a lawsuit or other proceeding, *if* such filing is made under seal.

17

(c)      *Employee is further notified that*, an individual who files a lawsuit for retaliation by his or her employer for reporting a suspected violation of law may disclose the Trade Secret to his or her attorney and use the Trade Secret information in the court proceeding, *if* the individual (i) files any document containing the Trade Secret under seal; *and* (ii) does not disclose the Trade Secret, except pursuant to court order.

4.      Best Efforts; Non-Competition During Employment.  Employee agrees that, during his or her employment with the Company, Employee will devote his or her best efforts to the performance of Employee's duties and the success of the Company.  Employee further agrees that he or she will not, during the period of his or her employment with the Company, (a) engage in any employment or activity other than for the Company (or if requested by the Company, a Company Party) in any business in which the Company is engaged or contemplates engaging, including the Company Business; (b) induce or attempt to induce any other employee of or contractor to a Company Party to engage in any such employment or activity; or (c) solicit any Customers or potential Customers of a Company Party to purchase products or services similar to those offered for sale or performed by the Company Parties even though not directly competitive with such products or services.

5.      Prior Commitments.  Employee has no other agreements, relationships, or commitments to any other person or entity that conflict with Employee's obligations to the Company under this Agreement or affect his or her ability to become or remain employed by the Company.

6.      Confidential, Proprietary, or Trade Secret Information of Others.  Employee will not disclose to the Company, or use, or induce the Company or any of its employees to use any confidential, proprietary, or Trade Secret information of others.  Employee represents and warrants that he or she does not possess and has returned all property and confidential information belonging to someone other than Employee, including any prior employers.

7.      Non-Recruitment of Company Employees.  Upon cessation of Employee's employment with the Company, whether by resignation or termination, and for twelve (12) months thereafter, Employee shall not use Confidential Information to directly or indirectly solicit, induce or attempt to persuade any employee or independent contractor of the Company, to leave the employ of or his or her independent contractor relationship with the Company.  At no time shall Employee interfere with the performance of other Company employees' or independent contractors' legal duties to the Company.  Employee acknowledges that this provision is necessary to protect Company Trade Secrets and Confidential Information.

8.      Employee Acknowledgments.  Employee recognizes and acknowledges each of the following: (a) the Company Parties have invested significant time and money in developing its Trade Secrets and Confidential Information; (b) the obligations imposed on Employee under this Agreement are reasonable and designed to protect the legitimate and protectable interest of the Company Parties, including their Trade Secrets and Confidential Information; (c) the restrictions contained in this Agreement do not preclude Employee from earning a livelihood, nor do they unreasonably impose limitations on Employee's ability to earn a living; (d) the potential harm to the Company Parties of the non-enforcement of the restrictions imposed on Employee under this Agreement outweighs any harm to Employee of the enforcement of the restrictions by injunction or otherwise; and (e) Employee's obligations under this Agreement are in addition to any and all obligations concerning the same subject matter arising under any applicable law, including by example, not limitation, common law relating to fiduciary duties and duty of loyalty and common law and statutory law relating to Trade Secrets.

9.      Company Access.  Employee agrees and consents that, during the term of Employee's employment with the Company and thereafter, the Company may review, audit, intercept, access and disclose to its attorneys, agents, or law enforcement, all messages created, received or sent over the electronic mail and internet access system provided by the Company Parties with or without notice to Employee and that such review, audit, interception, access, or disclosure may occur during or after working hours.  Employee further

consents and agrees that the Company may at any time access and review the contents of all computers, computer disks, servers, other data storage equipment and devices, files, desks, drawers, cabinets and work stations which are either on the Company Parties' premises or which are owned or provided by a Company Party. Employee understands and agrees that the Company's right to access includes access to Employee "personal" devices, such as smart phones or external storage devices, such as USB drives. While such devices may belong to the Employee, any Company Party Confidential Information or Trade Secrets residing on such devices belongs to the Company Parties (as applicable) and Employee hereby grants access to his or her personal devices for the purpose of the Company identifying any Company Party Confidential Information or Trade Secrets.

10.     Assignment of Inventions.

(a)     Employee will make full and prompt written disclosure to the Company of all Inventions, including any software, algorithms, potentially proprietary or patentable ideas, or other products, that are made, authored, created, derived, developed, invented, conceived, reduced to practice, or otherwise generated by Employee (alone or jointly with others) or under Employee's direction during the period of Employee's employment with the Company.

(b)     Employee acknowledges that all works of authorship that are made or derived by Employee (alone or jointly with others) within the scope of Employee's Service and which are protectable by copyright are  "works made for hire", as that term is defined in the United States Copyright Act (17 U.S.C., Section 101), and are owned exclusively by the Company.

(c)     Without limiting the foregoing, Employee hereby assigns and transfers to the Company and its successors and assigns all of Employee's right, title and interest in, to, and under any and all Inventions that (i) relate to the business of the Company Parties (including the Company Business) or any Customer of the Company Parties; (ii) result from tasks assigned to Employee by the Company Parties; (iii) result from the use of premises or personal property (whether tangible or intangible) owned, leased or contracted for by the Company Parties; or (iv) otherwise relate to the Company Parties' intellectual property, business, technology, or current or proposed products or services, whether or not actually made during normal business hours or on Company Parties' premises.

(d)     Employee agrees to cooperate with the Company now and in the future to take such steps as are necessary to further effect and document Employee's assignment of Inventions.  Employee will assist the Company in every proper way to obtain and enforce United States and foreign proprietary rights relating to any and all Inventions in any and all countries, including executing, verifying and delivering (1) such documents and performing such other acts (including appearing as a witness) as the Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such proprietary rights and the assignment thereof, and (2) assignments of such proprietary rights to the Company or its designee.  Employee's obligation to assist Company with respect to proprietary rights in any and all countries shall continue beyond the termination of Employee's Service, but the Company shall compensate Employee at a reasonable rate for any time actually spent by Employee at the Company's request on such assistance following termination of Employee's Services.

(e)     IN THE EVENT COMPANY IS UNABLE FOR ANY REASON, AFTER REASONABLE EFFORT, TO SECURE EMPLOYEE'S SIGNATURE ON ANY DOCUMENT NEEDED IN CONNECTION WITH THE ACTIONS SPECIFIED IN THE PRECEDING PARAGRAPH, EMPLOYEE HEREBY IRREVOCABLY DESIGNATES AND APPOINTS COMPANY AND ITS DULY AUTHORIZED OFFICERS AND AGENTS AS EMPLOYEE'S AGENT AND ATTORNEY-IN-FACT, TO ACT FOR AND ON MY BEHALF TO EXECUTE, VERIFY AND FILE ANY SUCH DOCUMENTS AND TO DO ALL OTHER LAWFULLY PERMITTED ACTS TO FURTHER THE PURPOSES OF THE PRECEDING PARAGRAPH WITH THE SAME LEGAL FORCE AND EFFECT AS IF EXECUTED BY EMPLOYEE. SUCH APPOINTMENT IS COUPLED WITH AN INTEREST. EMPLOYEE HEREBY WAIVES AND

QUITCLAIMS TO THE COMPANY ANY AND ALL CLAIMS OF ANY NATURE WHATSOEVER WHICH EMPLOYEE NOW OR MAY HEREAFTER HAVE FOR INFRINGEMENT OF ANY PROPRIETARY RIGHTS ASSIGNED TO THE COMPANY.

(f)    Employee understands that his or her obligations to assign Inventions to the Company do not apply to any Invention that is excluded from the requirements of this Section 11 by New York Labor Code.

11.    Termination of Employment.

(a)    At-Will Employment.  Employee acknowledges and agrees that Employee's employment with the Company is at-will, which means that either the Company or Employee may terminate the employment relationship at any time, for any reason or for no reason, and with or without advance notice. Nothing contained in this Agreement shall limit or otherwise alter the employment at-will relationship. However, Employee's failure to provide the Company very prompt notice of his or her acceptance of employment with a new employer may be used by the Company as evidence of purposeful delay by Employee for an improper purpose.

(b)    Return of Property.  In the event of termination (voluntary or otherwise) of Employee's employment with the Company, Employee agrees, promptly and without request, to deliver to and inform the Company of all documents and data pertaining to his or her employment and the Trade Secrets and Confidential Information of the Company Parties or their Customers, whether prepared by Employee or otherwise, coming into his or her possession or control, and to complete and sign the attached **Schedule D-3** to this Agreement. As used in this Agreement, "***Property***" includes any electronic, written or other tangible material, containing any information concerning or disclosing any of the Trade Secrets and Confidential Information of the Company Parties or their Customers.  Upon termination from the Company, Employee is entitled to retain non-Trade Secret documents concerning his or her employment-related wages and benefits provided by the Company.

(c)    Exit Interview Requirement.  Employee agrees to make himself or herself available for an exit interview with a designated Company representative at the time of Employee's departure from the Company.

(d)    Sanctions for Unauthorized Taking of Trade Secrets.  Employee recognizes that the unauthorized taking of any of Company's Trade Secrets may be a crime and expose Employee to civil liability.

12.    Company Notice to Third Parties.  Employee understands and agrees that the Company may, with or without prior notice to Employee, and during or after the Employee's employment with the Company, notify third parties of Employee's continuing agreements and obligations under this Agreement or any other agreement with the Company.

13.    Injunctive Relief; Cumulative Remedies.  Employee consents and acknowledges that breach of any obligation or promise set forth in this Agreement will have a material and adverse effect upon the Company and will cause the Company irreparable harm, and damages arising from any breach may be difficult to ascertain.  As such, in addition to all of the remedies otherwise available to the Company, including but not limited to, the recovery of monetary damages and reasonable attorneys' fees incurred in enforcing this Agreement, the Company shall have the right to injunctive relief to restrain and enjoin any actual or threatened breach of the provisions of this Agreement. All of the Company's remedies for breach of this Agreement shall be cumulative and the pursuit of one remedy shall not be deemed to exclude any other remedies.  Employee agrees and consents that the Company shall be entitled to injunctive relief, both preliminary and permanent, without bond.  If the Employee breaches any of the covenants in Section 3 of this Agreement, such covenants shall be extended by an amount of time equal to the duration of such breach or violation.

14.     Attorneys' Fees.  If any action is necessary to enforce this Agreement, the prevailing party shall be entitled to recover its attorneys' fees and associated costs.

15.     Understanding.  Employee acknowledges and agrees that the protections set forth in this Agreement are a material condition to his or her employment or continued employment with and compensation by the Company.

16.     Entire Agreement.  This Agreement expresses the entire understanding of the parties about the described subject matter.  This Agreement may not be amended except by an instrument in writing signed by both parties.  This Agreement shall be binding on the heirs, executors, administrators, and other legal representatives and assigns of Employee, and is for the benefit of the Company and its successors and assigns.

17.     Third Party Beneficiaries.  This Agreement is intended to benefit each and every Company Party or business unit of the Company as well as any of the Company Parties' Customers for which Employee performed services, for which Employee had Customer contact or about which Employee received Confidential, proprietary, or Trade Secret information and may be enforced by any such entity, as well as all other Company Party affiliates.  Employee agrees and intends to create a direct, consequential benefit to the Company regardless of the Company entity with which Employee is affiliated on the last day of Employee's employment or relationship with the Company.

18.     No Waiver.  No waiver or indulgence by the Company of any failure by Employee to keep or perform any promise or condition of this Agreement shall be a waiver of any preceding or succeeding breach of the same or any other promise or condition.  No waiver by the Company of any right shall be construed as a waiver of any other right.  The Company shall not be required to give notice to enforce strict adherence to all terms of this Agreement.

19.     Assignment.  The Company may assign and transfer this Agreement, or its interest in this Agreement, to any Company Affiliate or to any entity that is a party to a merger, reorganization, or consolidation with the Company, or to a subsidiary of the Company, or to any entity that acquires substantially all of the assets of the Company or any Company Affiliate with respect to which Employee is providing services.  Upon assignment, acquisition, merger, consolidation, or reorganization, the term "Company" as used herein will be deemed to refer Employee the assignee or successor entity.  This Agreement is personal in nature with respect to Employee, and therefore Employee will not have the right to assign Employee's interest in this Agreement, any rights under this Agreement, or any duties imposed under this Agreement. The Company and beneficiaries shall not be required to provide any further consideration for this assignment.  If the Company makes any assignment of the rights herein, including in connection with a sale or merger, Employee agrees that this Agreement shall remain binding upon Employee in any event.

20.     Severability and Modification.  Employee and the Company acknowledge that it was their intent to enter into a valid and enforceable agreement.  If any court of competent jurisdiction declares or determines that any provision of this Agreement is illegal, invalid, or unenforceable, the legality, validity and enforceability of the remaining parts, terms, and provisions will not be affected by such determination and the illegal, invalid, or unenforceable provision(s) of this Agreement shall be severed, except to the extent that such court determines that the activity or time period restrictions in a provision of this Agreement exceed that which is enforceable, in which case such provision shall be reformed by such court so as to make the activity and time period restrictions enforceable.  Employee and the Company agree to be bound by such judicial modification with the same force and effect if such modification were contained in this Agreement in the first instance.  The remainder of this Agreement shall be interpreted so as best to effect the intent of the parties hereto.

21.     Representation, Construction of Agreement.  Employee acknowledges that Employee has had the opportunity to obtain the advice of legal counsel of Employee's own choosing to fully understand the provisions of this Agreement.  Employee acknowledges that Employee has either obtained such legal counsel

or has voluntarily chosen not to do so.  This Agreement shall not be construed against the Company by reason of the drafting or preparation of this Agreement.

22.     Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

23.     Governing Law; Exclusive Jurisdiction.  This Agreement shall be construed, interpreted, and enforced, and its validity and enforceability determined in accordance with the laws of the State of New York without applying its conflicts of law principles.  All disputes under this Agreement shall be litigated exclusively in the Superior Court of New York, New York or the U.S. Southern District, and each of the parties hereto consents to the exclusive jurisdiction of such courts in any such proceeding and waives any objection to venue laid therein.

**EMPLOYEE HAS READ THIS AGREEMENT CAREFULLY AND UNDERSTANDS ITS TERMS.**

Dated:  2/22/2022_____

**EMPLOYEE**

*Jake Maxwell*

Employee Signature

Address for Notice:     30 Charlton Street, Apt 5K New York, NY 10014

Dated:  2/22/2022_____

**PRIME DATA CENTERS, LLC**

By:  _____

Name:  Nicholas Laag

Title:    CEO

22

## SCHEDULE D-1

## EMPLOYEE STATEMENT

1.      Confidential Information.  Except as set forth below, I acknowledge at this time that I have no knowledge regarding the Confidential Information of the Company or its Customers, except information that has been disclosed to me by the Company or its Customers **(if none, so state): (specify knowledge regarding Confidential Information or Inventions of the Company or its Customers).**

2.      Prior Inventions.  Except as set forth below, I acknowledge at this time that I have not made or reduced to practice (alone or jointly with others) any inventions **(if none, so state): (specify Inventions).**

3.      Conflicting Relationships.  Except as set forth below, I acknowledge that I have no other current or prior agreements, relationships, or commitments that conflict with my relationship with the Company under my Confidentiality, Trade Secrets, and Fair Competition Agreement **(if none, so state): (specify conflicts).**

Dated:          02/22/2022                          *Jake Maxwell*
                                                     Employee Signature

23

**SCHEDULE D-2**

**TRADE SECRETS AND CONFIDENTIAL INFORMATION TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, nor have I failed to return, any Company Party Trade Secrets or Confidential Information or copies of such information, or other documents or materials, equipment, or other property belonging to the Company Parties or their Customers.

I further certify that I have complied with and will continue to comply with all the terms of the Confidentiality, Trade Secrets, and Fair Competition Agreement (the "Agreement"), which I signed.

I further agree that, in compliance with the Agreement, I will preserve as confidential and not use any Trade Secrets, Confidential Information, or other information that has or could have commercial value or other utility in the business in which the Company Parties or their Customers are engaged or in which they contemplate engaging.

On termination of my employment with the Company, I will be employed by (specify name of new employer) _____ and will be working in connection with the following projects:                    (generally                    describe                    the                    projects) _____. (In requesting this information, the Company *is not* asking you to divulge or otherwise provide to the Company any confidential or Trade Secret information belonging to your new employer or any other person.)


Dated:

Employee Signature


24