**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMES MAXWELL and JOSEPH PATITO,<br><br>Plaintiffs,<br><br>v.<br><br>PRIME DATA CENTERS, LLC, DATA REALTY HOLDINGS CORP., NICHOLAS LAAG and ULRICH PELZ,<br><br>Defendants. | Case No. 1:26-cv-04493-PKC |

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE SECOND THROUGH TENTH CAUSES OF ACTION AND ALL CLAIMS AGAINST DATA REALTY HOLDINGS CORP.

LITTLER MENDELSON, P.C.
William J. Anthony
Jamie Haar
James F. Bryton
900 Third Avenue
New York, New York 10022-3298
212.583.9600
WAnthony@littler.com
JHaar@littler.com
JBryton@littler.com

*Attorneys for Prime Data Centers, LLC, Nicholas Laag, and Ulrich Pelz, and for Data Realty Holdings Corp. for the limited purpose of contesting personal jurisdiction*

# TABLE OF CONTENTS


I. PRELIMINARY STATEMENT ..... 1

II. FACTUAL BACKGROUND AND PLAINTIFFS' ALLEGATIONS ..... 1

A. The Parties and Plaintiffs' Employment Agreements ..... 1

B. Plaintiffs' Refusal to Sign New Compensation Documents ..... 2

C. Defendants' Alleged Communications With Other Current and Former Employees And Investors ..... 4

D. Plaintiffs' "Whistleblower Letter" and Resignation ..... 4

E. The 2024 Buyback and the 2026 Grain Transaction ..... 5

III. PROCEDURAL HISTORY ..... 5

IV. ARGUMENT ..... 6

A. Legal Standard on Motion to Dismiss ..... 6

1. Standard Under 12(b)(2) ..... 6

2. Standard Under 12(b)(6) ..... 6

B. Plaintiffs Fail to State a Civil RICO Claim ..... 7

1. Plaintiffs Do Not Plead Injury Proximately Caused by a RICO Violation ..... 7

2. The Alleged Corporate Enterprise Cannot and Does Not Cure the Other RICO Deficiencies ..... 8

3. The FAC Does Not Adequately Plead Predicate Wire Fraud ..... 9

4. The FAC Does Not Plead a Pattern of Racketeering Activity ..... 11

5. The RICO Conspiracy Claim Also Fails ..... 12

C. The Alter-Ego Declaratory Judgment Claim Fails ..... 14

D. The Quasi-Contract Claims Fail to the Extent Enforceable Agreements Govern the Claimed Compensation ..... 15

E. The Implied-Covenant Claim Should Be Dismissed to the Extent It Duplicates the Contract Claim ..... 17

F. Plaintiffs Fail to State a Labor Law § 740 Claim. ..... 18

G. Plaintiffs Fail to State a Fraudulent-Transfer Claim ..... 20

H. The Court Lacks Personal Jurisdiction Over DRH ..... 23

I. Further Leave to Amend Should Be Denied Where No Viable Cure Is Identified ..... 24

V. CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&M Glob. Mgmt. Corp. v. Northtown Urology Assocs., P.C.*,
115 A.D.3d 1283 (4th Dep't 2014) ....................21

*Aghaeepour v. N. Leasing Sys., Inc.*,
763 F. Supp. 3d 580 (S.D.N.Y. 2025), *aff'd*, No. 25-548, 2026 WL 1183399
(2d Cir. Apr. 29, 2026) ....................13

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006) ....................7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................6

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008) ....................7

*Caputo v. IESI NY Corp.*,
228 A.D.3d 480 (1st Dep't 2024) ....................20

*Cedric Kushner Promotions, Ltd. v. King*,
533 U.S. 158 (2001) ....................8

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) ....................6

*Charles Schwab Corp. v. Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018) ....................23

*Ciminelli v. United States*,
598 U.S. 306 (2023) ....................9, 11

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*,
70 N.Y.2d 382 (1987) ....................15

*Cofacrédit, S.A. v. Windsor Plumbing Supply Co.*,
187 F.3d 229 (2d Cir. 1999) ....................11, 12, 13

*Cruz v. FXDirectDealer, LLC*,
720 F.3d 115 (2d Cir. 2013) ....................17

*Cuoco v. Moritsugu*,
222 F.3d 99 (2d Cir. 2000)....................25

*Daebo Int'l Shipping Co. v. Ams. Bulk Transp. Ltd.*,
No. 12 Civ. 7960 (PAE), 2013 WL 2149595 (S.D.N.Y. May 17, 2013), *abrogated on other grounds by Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85 (2d Cir. 2023) ....................15

*EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co.*,
309 F. Supp. 3d 89 (S.D.N.Y. 2018)....................17

*First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*,
385 F.3d 159 (2d Cir. 2004)....................7, 10, 13

*Fletcher v. Atex, Inc.*,
68 F.3d 1451 (2d Cir. 1995)....................14

*Foman v. Davis*,
371 U.S. 178 (1962)....................24

*GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*,
67 F.3d 463 (2d Cir. 1995)....................12

*Holmes v. Sec. Inv'r Prot. Corp.*,
503 U.S. 258 (1992)....................7

*Jonas v. Estate of Leven*,
116 F. Supp. 3d 314 (S.D.N.Y. 2015)....................6

*JoySuds, LLC v. Awesome Products, Inc.*,
No. 25 Civ. 2977 (DEH), 2026 U.S. Dist. LEXIS 30584 (S.D.N.Y. Feb. 13, 2026) ....................24

*Kagan v. K-Tel Ent., Inc.*,
172 A.D.2d 375 (1st Dep't 1991) ....................16

*Landell v. Life Bridge Dental PLLC*,
236 A.D.3d 520 (1st Dep't 2025) ....................19

*Lundy v. Cath. Health Sys. of Long Island Inc.*,
711 F.3d 106 (2d Cir. 2013)....................9

*Mandarin Trading Ltd. v. Wildenstein*,
16 N.Y.3d 173 (2011) ....................16

*Morris v. N.Y. State Dep't of Tax'n & Fin.*,
82 N.Y.2d 135 (1993) ....................15

*Northwell Health, Inc. v. Grp. Hospitalization & Med. Servs., Inc.*,
183 F.4th 78 (2d Cir. 2026) ....................16

*Palatkevich v. Choupak*,
Nos. 12 Civ. 1681 (CM), 2014 WL 1509236 (S.D.N.Y. Jan. 24, 2014) ....................11

*Patterson Belknap Webb & Tyler LLP v. Marcus & Cinelli LLP*,
227 A.D.3d 505 (1st Dep't 2024) ....................22

*Penguin Grp. (USA) Inc. v. Am. Buddha*,
609 F.3d 30 (2d Cir. 2010)....................6

*PT United Can Co. v. Crown Cork & Seal Co.*,
138 F.3d 65 (2d Cir. 1998)....................23

*Randall's Is. Aquatic Leisure, LLC v. City of N.Y.*,
92 A.D.3d 463 (1st Dep't 2012) ....................17

*Reich v. Lopez*,
858 F.3d 55 (2d Cir. 2017)....................12

*Reliance First Cap., LLC v. Mid Am. Mortg., Inc.*,
No. 18-CV-3528 (SFJ) (ARL), 2019 WL 2504039 (E.D.N.Y. June 17, 2019)....................6, 9, 11

*Salinas v. United States*,
522 U.S. 52 (1997)....................12

*Securitron Magnalock Corp. v. Schnabolk*,
65 F.3d 256 (2d Cir. 1995)....................9

*Sols. Express Ltd. v. Ashley Furniture Indus., Inc.*,
No. 20-cv-07843 (CS), 2023 WL 2393861 (S.D.N.Y. Mar. 7, 2023) ....................16

*Spherenomics Glob. Contact Ctrs. v. Customer Corp.*,
427 F. Supp. 2d 236 (E.D.N.Y. 2006) ....................16

*State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*,
375 F. Supp. 2d 141 (E.D.N.Y. 2005) ....................12

*Sullivan v. Barclays PLC*,
No. 13-cv-2811 (PKC), 2017 U.S. Dist. LEXIS 25756 (S.D.N.Y. Feb. 21, 2017) ....................9

*Sullivan v. UBS AG*,
149 F.4th 206 (2d Cir. 2025) ....................9

*United States v. Applins*,
637 F.3d 59 (2d Cir. 2011)....................12

*United States v. Autuori*,
212 F.3d 105 (2d Cir. 2000)....9

*United States v. D'Amato*,
39 F.3d 1249 (2d Cir. 1994)....10

*Williams v. Equitable Acceptance Corp.*,
443 F. Supp. 3d 480 (S.D.N.Y. 2020)....8

**Statutes**

18 U.S.C. § 1343....9, 10

18 U.S.C. § 1962(c) ....7

18 U.S.C. § 1962(d) ....12

18 U.S.C. § 1964(c) ....7

18 U.S.C. § 1965(b) ....23

N.Y. Debt. & Cred. Law § 273(a)(1)....20, 21, 23

N.Y. Debt. & Cred. Law § 273(b) ....21, 22

N.Y. Debt. & Cred. Law § 276....21, 23

N.Y. Debt. & Cred. Law § 277....23

N.Y. Debt. & Cred. Law § 277(b)(1)....21

N.Y. Debt. & Cred. Law § 277(b)(1)(i)....22

N.Y. Debt. & Cred. Law § 279....20

N.Y. Debt. & Cred. Law § 279(a)(3)....20

N.Y. Debt. & Cred. Law § 279(b) ....20

N.Y. Lab. Law § 740 ....18, 19, 20

N.Y. Lab. Law § 740(1)(d)....18

N.Y. Lab. Law § 740(1)(e) ....18

N.Y. Lab. Law § 740(1)(f)....18

N.Y. Lab. Law § 740(2)....18

N.Y. Lab. Law § 740(2)(a) ....................18

N.Y. Lab. Law § 740(2)(c) ....................18

N.Y. Lab. Law § 740(2)(a)–(c) ....................18

N.Y. Lab. Law § 740(4)(a) ....................19

**Other Authorities**

Fed. R. Civ. P. 8 ....................5, 24

Fed. R. Civ. P. 8(d) ....................16

Fed. R. Civ. P. 9(b) ....................1, 7, 9

Fed. R. Civ. P. 12(b) ....................23

Fed. R. Civ. P. 12(b)(2) ....................6

Fed. R. Civ. P. 12(b)(6) ....................6

Fed. R. Civ. P. 12(h)(1) ....................23

Fed. R. Civ. P. 15(a)(2) ....................24

Local Civil Rule 7.1(c) ....................27

N.Y. C.P.L.R. 302(a)(1) ....................23

## I. PRELIMINARY STATEMENT

Plaintiffs attempt to spin a variety of alleged claims and legal theories out of a straightforward breach of contract claim yet fail to plausibly allege facts sufficient do support those claims and/or state viable legal claims based on the facts alleged in the First Amended Complaint ("FAC"). These claims warrant dismissal for a variety of reasons.

Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") fail principally on causation, predicate fraud, and continuity. Even assuming unpaid compensation supplies an Article III injury, the FAC does not plausibly connect that loss to the alleged racketeering conduct. The alleged conduct was based on statements allegedly made to induce them into agreeing to amendments to their EAs, which they claim to have repeatedly rejected. Thus, there is no injury. It is that simple. Additionally, the alleged wire-fraud predicates must satisfy Rule 9(b), and the FAC must establish closed-ended or open-ended continuity and a plausible racketeering agreement. Defendants address the corporate-enterprise alternatives separately without disputing that natural persons are distinct from the corporations whose affairs they conduct. If the RICO claims are dismissed, the Court should also assess the prerequisites for nationwide service over Data Realty Holdings Corp. ("DRH").

The central alleged injury is Prime's alleged failure to pay compensation purportedly owed under the Employment Agreements. Defendants therefore seek dismissal of the Second through Tenth Causes of Action and, as to DRH, dismissal of all claims for lack of personal jurisdiction or, alternatively, on the merits basis addressed below.

## II. FACTUAL BACKGROUND AND PLAINTIFFS' ALLEGATIONS

### A. The Parties and Plaintiffs' Employment Agreements

Patito is an individual residing in New York while Maxwell resides in Illinois. (FAC ¶¶ 1–2.) Prime is a Delaware limited liability company, headquartered in Dallas, Texas, which develops

and operates data centers. (FAC ¶¶ 3, 10.) DRH is a Delaware corporation with its principal place of business in McClellan, California.

Defendant Nicholas Laag ("Laag") is Prime's Chief Executive Officer, and Defendant Ulrich Pelz ("Pelz") is its Chief Financial Officer. Plaintiffs allege that Laag, directly or indirectly through a chain of holding entities including DRH, held a majority interest in and exercised control over Prime, and that Pelz exercises financial control over the same entities. (*Id.* ¶¶ 4–6, 106.)

Prime employed Patito and Maxwell from February 2022 until February 2, 2026, when they resigned, a departure they characterize as a constructive discharge. (FAC ¶ 11.) Plaintiffs allege that Pelz, Laag, Patito, and Maxwell primarily worked out of Prime's New York office. (FAC ¶ 12.) Each Plaintiff entered a written Employment Agreement with Prime; the agreements are attached to the FAC as Exhibits 1 and 2. (FAC ¶ 14.) References below to "FAC Ex." identify those attachments, and references to Exhibits B and C identify the compensation schedules within each agreement. Plaintiffs allege that the agreements are valid, enforceable, and supported by consideration, and permit modification only through a signed writing. (FAC ¶ 15; FAC Exs. 1–2 §§ 10.2–10.3, 10.12.) DRH did not employ Plaintiffs and is not a party to their Employment Agreements. (FAC ¶¶ 11, 14.)

Plaintiffs allege that Section 3.1 defines compensation by reference to Exhibit B (salary, discretionary bonuses, performance fees, and co-investment rights), Section 3.3 incorporates the Incentive Plan attached as Exhibit C, including its net asset value ("NAV") methodology, and Section 4.2 addresses compensation payable on termination. (FAC ¶¶ 16–24; FAC Exs. 1–2 §§ 3.1, 3.3, 4.2 & Exs. B–C.)

**B. Plaintiffs' Refusal to Sign New Compensation Documents**

According to Plaintiffs, Prime's value increased substantially after they joined the company, thereby increasing the value of the equity-linked compensation contemplated by their

Employment Agreements. FAC ¶¶ 25–26, 82–83. Plaintiffs allege that Laag and Pelz, recognizing the Employment Agreements' increasing value, constructed a new "compensation scheme" to "circumvent paying material compensation obligations under the [Employment Agreements] owed to employees, including Plaintiffs and reduce dilution." (*Id.* ¶¶ 26–27.)

Beginning in 2023, Prime proposed replacement phantom-share programs ("PSP1" and later "PSP2") with different milestone, vesting, and valuation terms. Plaintiffs allege that those programs materially altered the compensation structure in the Employment Agreements and were designed to reduce Defendants' obligations. Laag and Pelz allegedly told Plaintiffs that their Employment Agreement compensation had little or no value while urging them to accept the new programs. (FAC ¶¶ 27–31, 42, 46–51.)

The FAC describes proposed compensation arrangements that Plaintiffs disputed and declined to accept. Plaintiffs allege that they repeatedly objected to PSP1 and PSP2, maintained that the proposed programs did not conform to their Employment Agreements, and refused to agree to any modification of their contractual rights. (FAC ¶¶ 43–44, 49–50, 57–58.) Their pleaded position is thus that the original agreements remained controlling notwithstanding the proposed replacement programs.

In July 2023, Maxwell characterized PSP1 as "a substantive re-trade rather than a faithful implementation of the existing EAs" and refused to sign it, and both Plaintiffs allegedly maintained that they did not agree to any modification. (FAC ¶¶ 43–44, 58.) Plaintiffs allege that, beginning in January 2024, Prime conditioned a $60,000 salary increase, and later payment of a deferred bonus, on acceptance of the new program, that they refused, and that Laag stated on January 6, 2024, that the packages were "agreed in total or not at all." (*Id.* ¶¶ 49, 57.) They also challenge the January 9, 2024 "EA & Comp Comparison" letters as misleadingly describing NAV, vesting,

strike prices, and Incentive Plan language, but those allegations concern disputed descriptions of the original agreements and proposed alternatives that Plaintiffs did not accept. (*Id.* ¶¶ 50–51.)

### C. Defendants' Alleged Communications With Other Current and Former Employees And Investors

Plaintiffs devote substantial portions of the FAC to communications concerning third-party investments, financing, and employee compensation disclosures. (FAC ¶¶ 59–80.) Those allegations do not explain how any investor communication caused Prime to withhold compensation allegedly due under Plaintiffs' Employment Agreements. Plaintiffs do not allege that these communications modified their agreements or caused them to surrender contractual rights, and they disclaim recovery for losses sustained by investors, the Board, or the outside auditor. (*Id.* ¶ 59 n.2.) Whatever relevance those allegations may have to other theories, the RICO claims require a sufficiently pleaded predicate act that directly caused Plaintiffs' own alleged loss.

The FAC also describes communications between Laag and other current or former employees about those employees' own agreements, and asserts, without detail, that Defendants "target[ed]" four others "by telling them their units are worthless." (*Id.* ¶¶ 35–41.)

### D. Plaintiffs' "Whistleblower Letter" and Resignation

On April 21, 2025, Plaintiffs allege that they sent a "whistleblower letter" to two of Prime's investors, Ares and Macquarie (FAC ¶¶ 55, 78). Laag allegedly called the letter a "mistake" and told Patito, "if you have no trust and don't learn from your mistakes . . . I am not sure how we can help or be partners." (*Id.* ¶ 72.)

In July 2025, Maxwell allegedly forwarded a prospective investor's diligence questions to Prime's outside auditor and attended a meeting with Pelz, the auditor, and tax counsel about the incentive plan's implementation and reporting. (FAC ¶¶ 70, 75.) Patito also allegedly "pressed for accurate compensation disclosures" to the Board and to Ernst & Young. (FAC ¶ 72.) Plaintiffs

continued working until they resigned on February 2, 2026, and sent a demand letter through counsel the next day. (FAC ¶¶ 11, 78.) They allege that Defendants failed to provide compensation purportedly owed under the Employment Agreements, including performance fees, co-investment rights, phantom-equity compensation, and bonuses. (FAC ¶¶ 81–93.) Patito alleges damages of at least $188.7 million, and Maxwell alleges damages of at least $65.6 million. (FAC ¶¶ 85–86.)

Although Plaintiffs allege that Prime employed them and entered into the Employment Agreements at issue, they also seek relief against DRH, which they contend shares common ownership and management with Prime and operates as Prime's alter ego. FAC ¶¶ 4–6, 11, 14, 87–88, 89–92, 170–74.

### E. The 2024 Buyback and the 2026 Grain Transaction

In June 2024, Plaintiffs allege that Prime used approximately $28 million—funded by a loan to Laag's holding company—to repurchase 150,000 units from its investor Macquarie, which allegedly kept Laag's entities from losing 28,591 units to other investors. (*Id.* ¶ 67.) In March 2026, Plaintiffs allege that Grain Management made a $500 million preferred-equity investment in DRH, which DRH used to buy Prime equity held by an Ares/Macquarie entity and to refinance a loan at another Laag-affiliated entity. (*Id.* ¶¶ 76, 162, 165.)

## III. PROCEDURAL HISTORY

Plaintiffs commenced this action on May 28, 2026. (ECF No. 1.) After Defendants identified deficiencies in the original complaint and the Court directed compliance with Rule 8, Plaintiffs filed the FAC on September 10, 2026. (ECF Nos. 16, 22, 24.) In response to Defendants second pre-motion letter, Plaintiffs stated that they "do not seek leave to amend the FAC," while reserving the right to request leave upon reviewing the motion. (ECF Nos. 25–26; ECF No. 26 at 1.) The Court thereafter set a briefing schedule. (ECF No. 27.)

# IV. ARGUMENT

## A. Legal Standard on Motion to Dismiss

### 1. Standard Under 12(b)(2)

Plaintiffs bear the burden of establishing personal jurisdiction and, at this stage, must make a prima facie showing through legally sufficient factual allegations. *Jonas v. Estate of Leven*, 116 F. Supp. 3d 314, 323 (S.D.N.Y. 2015); *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010). They must establish jurisdiction with respect to each asserted claim. *Jonas*, 116 F. Supp. 3d at 323.

Although reasonable factual inferences favor Plaintiffs, argumentative inferences and legal conclusions cast as factual allegations do not establish jurisdiction. *Reliance First Cap., LLC v. Mid Am. Mortg., Inc.*, No. 18-CV-3528 (SFJ) (ARL), 2019 WL 2504039, at *6 (E.D.N.Y. June 17, 2019).

### 2. Standard Under 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead facts adequate "to state a claim that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint requires more than unadorned assertions: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

The Court may also consider documents attached to or incorporated by reference in the complaint, including the Employment Agreements on which the compensation claims rely. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002).

### B. Plaintiffs Fail to State a Civil RICO Claim

To state a claim under 18 U.S.C. § 1962(c), Plaintiffs must plausibly allege the conduct of an enterprise through a pattern of racketeering activity, injury to business or property, and factual and proximate causation. *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173, 176, 178, 182 (2d Cir. 2004). Because Plaintiffs rely exclusively on wire fraud as the alleged predicate activity, their fraud allegations must also satisfy Rule 9(b). *Id.* at 178–79.

#### 1. Plaintiffs Do Not Plead Injury Proximately Caused by a RICO Violation

Assuming Plaintiffs allege an economic injury sufficient for Article III, which they do not, they must separately plead that a RICO violation factually and proximately caused that injury. Section 1964(c)'s "by reason of" requirement demands a direct relationship between the alleged predicate conduct and the asserted injury. *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268–69 (1992); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458–60 (2006). Plaintiffs seek compensation allegedly owed under the Employment Agreements, while the principal alleged misrepresentations concern PSP1 and PSP2, proposed replacement arrangements that they refused to accept. (FAC ¶¶ 14–24, 43–44, 49–58, 81–93.) The FAC must explain how those communications nevertheless caused the compensation loss. Repetition of the allegation that compensation went unpaid does not supply that missing causal link. Moreover, Plaintiffs rely on the EAs, specifically Ex. C to each which indicates that the "Incentive Plan" "will be implemented and added before end of Q2 of 2022" and provides no payout provisions or deadlines. (FAC Exhibits 1 and 2.) In other words, as a threshold matter, Plaintiffs do not even establish a claim for any money being due under their EAs.

First-party reliance is not invariably required, but proximate cause remains essential. Lack of reliance by anyone ordinarily defeats even but-for causation. *Bridge v. Phoenix Bond & Indem.*

*Co.*, 553 U.S. 639, 649, 654, 658–59 (2008). Unlike the scheme in *Williams v. Equitable Acceptance Corp.*, 443 F. Supp. 3d 480, 498, 503 (S.D.N.Y. 2020), which allegedly caused borrowers to incur payment obligations, even taking Plaintiffs' allegations as true, Plaintiffs did not relinquish any contractual rights. Nor does the FAC explain how another employee's reliance or a statement to an investor or auditor directly reduced Plaintiffs' compensation. Plaintiffs expressly disclaim recovery for injury to investors, the Board, or the auditor. (FAC ¶ 59 n.2.) The deficiency is the missing causal connection, not the availability of a contract remedy or the fact that the amount of compensation is disputed. Plaintiffs' claim fails as a matter of law.

Plaintiffs continued-services and delayed-enforcement theories require the same connection between an identified deception and an identified loss. The FAC does not connect a particular assurance to specified uncompensated services, a foregone employment opportunity, or a concrete impairment of an enforcement right. General allegations that Plaintiffs continued working while disputing Defendants' interpretation of their agreements do not supply that connection. Further, paragraph 117's assertion that Plaintiffs otherwise would have accepted greater cash compensation cannot be reconciled with the FAC's own chronology. PSP communications beginning in 2023 cannot have caused Plaintiffs' agreement to lower base salaries in early 2022. (FAC ¶¶ 14, 17, 28–31, 42, 117.)

### 2. The Alleged Corporate Enterprise Cannot and Does Not Cure the Other RICO Deficiencies

Plaintiffs identify Laag and Pelz as the RICO persons and Prime and DRH as the corporate enterprise. (FAC ¶¶ 4–6, 87–88, 106; ECF No. 26 at 2–3.) Defendants do not dispute that natural persons are distinct from the corporation whose affairs they conduct, *see Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001), but that distinctness satisfies only the person-enterprise element. Whether Prime is the enterprise or Prime and DRH form an association-in-fact,

the alleged affiliation between them supplies no substitute for the causation, predicate-fraud, and continuity elements addressed in Sections IV.B.1 and IV.B.3–4. *See Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 263–64 (2d Cir. 1995).

**3. The FAC Does Not Adequately Plead Predicate Wire Fraud**

Predicate wire fraud requires a scheme to obtain money or property by material deception, fraudulent intent, and use of interstate or foreign wire communications in furtherance of the scheme. 18 U.S.C. § 1343; *Sullivan v. Barclays PLC*, No. 13-cv-2811 (PKC), 2017 U.S. Dist. LEXIS 25756, at *98 (S.D.N.Y. Feb. 21, 2017) (citing *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000)), *aff'd in part, rev'd in part, vacated in part sub nom. Sullivan v. UBS AG*, 149 F.4th 206 (2d Cir. 2025). The scheme must target a traditional property interest, not merely a right to accurate information for economic decision-making. *Ciminelli v. United States*, 598 U.S. 306, 309, 316 (2023). Where the scheme rests on alleged misrepresentations, Rule 9(b) requires identification of the challenged statements, their speakers, when and where they were made, and why they were fraudulent, together with facts supporting a strong inference of fraudulent intent. *Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013); *First Cap.*, 385 F.3d at 178–79. The Second Circuit affirmed dismissal of the RICO claims in *Sullivan* because the wire-fraud allegations did not satisfy Rule 9(b); generalized allegations of a broader scheme do not replace sufficiently particular allegations of predicate fraud. *Sullivan*, 149 F.4th at 221–22.

The January 2024 comparison letters identify more specific communications than the FAC's generalized assurances, but the FAC must still explain why the challenged descriptions of vesting, strike prices, plan language, and value were knowingly false when made. (FAC ¶¶ 49–51.) An email communicating a disputed contractual interpretation does not establish wire fraud without particularized allegations of deception and intent. *See First Cap.*, 385 F.3d at 178–79. To the extent the theory rests on a promise of future performance, nonperformance alone does not

establish that the promisor lacked an intent to perform when the promise was made. *See United States v. D'Amato*, 39 F.3d 1249, 1261 n.8 (2d Cir. 1994). The alleged motive to reduce compensation expense or dilution likewise does not replace facts supporting fraudulent intent. *First Cap.*, 385 F.3d at 179.[1]

The allegations concerning other employees may bear on an asserted broader scheme but must still provide the particulars necessary to support the alleged predicates. The FAC describes separate agreements, predictions concerning value, and generalized discrepancies, not the required predicates. (FAC ¶¶ 35–41.) As to Holub, King, Collins, and Kuebler, it supplies no dates or statements beyond the assertion that Defendants told them their units were "worthless." (*Id.* ¶ 41.) Without the circumstances, alleged agreements, basis for contemporaneous falsity, and facts supporting intent, those allegations do not cure the pleaded fraud deficiencies.

The investor and auditor allegations require a similarly concrete account of the property targeted, the material deception employed, and how the alleged wires furthered the scheme. General references to diligence, disclosures, and valuation disagreements do not consistently identify the speaker, recipient, statement, timing, and basis for falsity of the alleged communications. (FAC ¶¶ 59–75.) Nor does quoting the November 24, 2023, plan abstract or Pelz's statement that the obligation needed to be disclosed resolve the issue: the FAC must explain what was knowingly false or deceptively omitted, rather than ask the Court to infer fraud merely from disagreement over the plan or its accounting treatment. (*Id.* ¶¶ 32, 46.) And to the extent these allegations describe the deprivation of information relevant to the investor's or the auditor's economic decisions, that is the "right to control" theory the Supreme Court rejected as a basis for

[1] Plaintiffs' rejection of the proposals bears principally on causation; it does not categorically exclude an unsuccessful scheme from § 1343.

wire fraud. *Ciminelli*, 598 U.S. at 316. Even adequately pleaded investor-directed fraud would leave the separate causation deficiency addressed in Section IV.B.1.

The ruling in *Palatkevich v. Choupak*, Nos. 12 Civ. 1681 (CM), 2014 WL 1509236 (S.D.N.Y. Jan. 24, 2014), does not support a different result. The employees there identified specifically dated communications allegedly used to procure continued services and divert vested shares, alleging that the same equity scheme was the defendants' recurring method of obtaining employee labor. *Id.* at *15, *18–19. Here, the alleged communications did not procure Plaintiffs' surrender of contractual rights or additional services tied to a particular deception, and the FAC's generalized references to investor diligence, compensation discussions, and assurances do not plead the content, falsity, and fraudulent intent for each predicate.

**4. The FAC Does Not Plead a Pattern of Racketeering Activity**

Closed-ended continuity requires related predicates extending over a substantial period. Duration is assessed using adequately pleaded predicate acts, not the entire employment relationship or the period during which compensation remained disputed. The number and variety of acts, participants, victims, and schemes also bear on the analysis; multiple schemes or criminal purposes are not categorical prerequisites. *First Cap.*, 385 F.3d at 181–82; *Cofacrédit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999). The FAC describes PSP communications beginning in 2023, January 2024 comparison letters, and investor or auditor communications in 2025. (FAC ¶¶ 28–31, 42–51, 59–75.) But elapsed calendar time alone does not establish the duration of racketeering activity. For the reasons in Section IV.B.3, the generalized recruitment allegations, diligence communications, and later denials do not adequately identify fraudulent predicates with the required particulars. The sufficiently identified compensation proposals concern the same disputed agreements and objective. Because the FAC does not adequately plead the predicate acts necessary to establish a beginning and end to a

substantial period of racketeering activity, its broader chronology does not cure the continuity deficiency.

Open-ended continuity requires a threat of continuing racketeering activity. Where an enterprise principally conducts legitimate business, Plaintiffs must plead facts showing that the predicates are its regular way of conducting business or otherwise threaten repetition. *Cofacrédit*, 187 F.3d at 242–44; *Reich v. Lopez*, 858 F.3d 55, 60–61 (2d Cir. 2017). Prime's legitimate business does not itself foreclose such a showing. Here, however, the alleged objective concerns replacing or reducing identified compensation obligations, rather than an adequately pleaded recurring practice of procuring labor through fraudulent promises. The allegations concerning other employees identify no dates, specific deceptions, or resulting transactions, and do not plausibly establish such a recurring practice. (FAC ¶¶ 35–41.) The possibility that Prime will hire employees or offer incentive compensation in the future does not, without those particulars, show a threat of continuing wire fraud. *See GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 466 (2d Cir. 1995).

**5. The RICO Conspiracy Claim Also Fails**

A § 1962(d) claim requires a plausible agreement to further an endeavor that, if completed, would satisfy substantive RICO. *United States v. Applins*, 637 F.3d 59, 74–75 (2d Cir. 2011). The agreement is the prohibited act, and a conspirator need not personally commit, or agree to personally commit, two predicate acts. It suffices that the defendant knowingly agrees that members of the conspiracy will commit at least two. *Salinas v. United States*, 522 U.S. 52, 65 (1997) (a conspirator need only "adopt the goal of furthering or facilitating the criminal endeavor"); *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, 375 F. Supp. 2d 141, 150–51 (E.D.N.Y. 2005) ("With respect to predicate acts, plaintiff must allege only that defendants agreed to commit at least two predicate RICO acts, not that defendants themselves committed the

two predicate acts, or even that these acts were carried out."); *see also Aghaeepour v. N. Leasing Sys., Inc.*, 763 F. Supp. 3d 580, 592 (S.D.N.Y. 2025), *aff'd*, No. 25-548, 2026 WL 1183399 (2d Cir. Apr. 29, 2026). Thus, to avoid dismissal, Plaintiffs must plausibly allege that agreement and its unlawful object, and the FAC does not.

The FAC alleges that Laag and Pelz jointly designed compensation programs and communicated with employees and investors but does not plausibly connect that coordination to an agreement to pursue a qualifying pattern of wire fraud. Corporate coordination alone does not establish the unlawful object of the alleged agreement. The predicate and continuity deficiencies addressed above leave the FAC without a sufficiently pleaded racketeering endeavor, and the conspiracy allegations do not supply the missing connection between that endeavor and Plaintiffs' alleged compensation loss. Dismissal is warranted on those grounds, not merely because the substantive count is dismissed. *See First Cap.*, 385 F.3d at 182; *Cofacrédit*, 187 F.3d at 244.

The conspiracy claim is also asserted against all four Defendants, yet the FAC pleads no facts showing an agreement among Laag, Pelz, Prime, and DRH to pursue any criminal objective. The FAC does not allege when or how either entity joined an agreement, what it agreed to, or what unlawful object it shared with the individual Defendants. Plaintiffs' conspiracy theory as to Prime and DRH therefore depends on treating them as Laag and Pelz in all but name, which is to say, on the alter-ego allegations. For the reasons in Section IV.C, those allegations do not plausibly show that the entities are indistinguishable from Laag and Pelz, and common ownership and control do not supply an agreement the FAC otherwise omits. Without that attribution, the FAC describes at most parallel business decisions by commonly controlled entities, which does not support a plausible inference of an agreement to commit racketeering.

### C. The Alter-Ego Declaratory Judgment Claim Fails

The Tenth Cause of Action seeks to hold DRH responsible for Prime's obligations by declaring DRH Prime's alter ego. That theory requires a governing-law analysis because both entities are organized in Delaware. (FAC ¶¶ 3–4.) New York choice-of-law principles ordinarily look to the law of the entity's organization when deciding whether to disregard its separate existence. *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995). Under Delaware law, an alter-ego theory requires facts showing operation as a single economic entity and an overall element of injustice or unfairness in the use of the entity form. *Id.* at 1457–58. Relevant considerations include capitalization, solvency, observance of formalities, corporate records, siphoning of funds, and whether the entity functioned as a facade. *Id.* at 1458.

The FAC does not adequately supply those facts. Paragraph 87's assertion of domination must be supported by allegations showing how DRH disregarded Prime's separate existence in the transactions at issue. The overlapping roles and ownership alleged in paragraphs 4–6 do not alone establish that the entities operated as one. Nor does the appreciation of DRH's Prime equity, invoked in paragraphs 88 and 173, itself show misuse of the entity form. A holding company's benefit from an investment is not equivalent to siphoning the operating company's assets or using it as a facade.

Paragraphs 170–174 must likewise connect the asserted disregard of separateness to the wrong for which Plaintiffs seek to impose liability. Prime's alleged failure to pay under its Employment Agreements does not, without facts showing abuse of the entity form, make an affiliated equity holder liable for that breach. Moreover, there is no payment provision in Exhibit C in the first place. The separate allegations concerning the buyback and Grain transaction must establish their own factual connection to that abuse, rather than assume that common control makes every transaction a transfer by Prime. (FAC ¶¶ 67, 76, 162, 165–66.) The requested declaration

concerns Prime and DRH; allegations that Laag and Pelz controlled both entities do not independently establish a basis to disregard either entity's separateness from the individuals.

The claim also fails under New York law, which requires complete domination and use of that domination to commit the fraud or wrong causing the injury; veil-piercing supplies a means of imposing liability on an underlying claim, not an independent cause of action. *Morris v. N.Y. State Dep't of Tax'n & Fin.*, 82 N.Y.2d 135, 141–42 (1993). Common ownership, management, and unpaid contractual compensation do not adequately establish misuse of domination. The requested declaration merely restates that deficient derivative-liability theory and adds no independent basis for relief. *See Daebo Int'l Shipping Co. v. Ams. Bulk Transp. Ltd.*, No. 12 Civ. 7960 (PAE), 2013 WL 2149595, at *3 (S.D.N.Y. May 17, 2013), *abrogated on other grounds by Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 96–101 (2d Cir. 2023).

### D. The Quasi-Contract Claims Fail to the Extent Enforceable Agreements Govern the Claimed Compensation

In the First Cause of Action, Plaintiffs set forth a claim for breach of contract against Prime and allege there was an offer and acceptance, and the contracts are valid and enforceable and supported by consideration. (FAC ¶¶ 15, 90, 140.) Despite these allegations, Plaintiffs fail to allege how exactly the contracts were breached as Exhibit C provides for no payment to them.

Moreover, a valid and enforceable agreement governing the disputed subject matter precludes quasi-contract recovery. *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388–89 (1987). Sections 3.1 and 3.3 of the Employment Agreements and their Exhibits B and C expressly address the services and compensation for which Plaintiffs seek equitable recovery; § 4.2 addresses accrued and vested benefits on termination. (FAC Exs. 1–2 §§ 3.1, 3.3, 4.2 & Exs. B–C.) Uncertainty about Exhibit C does not place the independently specified Exhibit B performance fees and co-investment compensation outside the agreements. (FAC ¶¶ 16–24, 131.)

The asserted equitable theories should be dismissed as far as they seek that contract-governed compensation. *See Spherenomics Glob. Contact Ctrs. v. Customer Corp.*, 427 F. Supp. 2d 236, 253 (E.D.N.Y. 2006); *Sols. Express Ltd. v. Ashley Furniture Indus., Inc.*, No. 20-cv-07843 (CS), 2023 WL 2393861, at *5 (S.D.N.Y. Mar. 7, 2023).

Rule 8(d) permits alternative pleading where contractual coverage or enforceability remains genuinely disputed. *Northwell Health, Inc. v. Grp. Hospitalization & Med. Servs., Inc.*, 183 F.4th 78, 100–01 (2d Cir. 2026). Plaintiffs invoke that contingency specifically for Exhibit C. (FAC ¶¶ 96, 127, 135.) Section 3.3's incorporation of the plan establishes the contractual framework for incentive compensation; a disagreement over the amount payable does not defeat contractual coverage. The equitable claims should therefore be dismissed as to obligations governed by enforceable provisions, with any surviving alternative theory confined to compensation whose contractual coverage or enforceability remains genuinely unresolved.

The DRH claims also require analysis beyond its status as a nonsignatory. Plaintiffs allege that their services increased DRH's Prime equity value and facilitated additional equity interests. (FAC ¶¶ 128–31.) *Northwell Health* forecloses treating the absence of a direct contract as fatal where the defendant's conduct and acceptance of benefits create a sufficiently close relationship. 183 F.4th at 100–01. Here, however, the alleged appreciation of an affiliated owner's investment does not show that DRH requested Plaintiffs' services or undertook a compensation relationship distinct from Prime's employment arrangements. Plaintiffs must identify facts supporting that relationship, not only the economic benefit an owner derives from an operating company's success. *See Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011); *Kagan v. K-Tel Ent., Inc.*, 172 A.D.2d 375, 376 (1st Dep't 1991). To the extent a binding agreement governs the same services and compensation, that contractual coverage also bars recovery against a third-party

nonsignatory on the same subject matter. *See Randall's Is. Aquatic Leisure, LLC v. City of N.Y.*, 92 A.D.3d 463, 464 (1st Dep't 2012). Defendants therefore seek dismissal on the pleaded relationship-or-promise deficiencies independently of any contractual bar, and on contractual duplication only insofar as the relevant obligation is governed by an enforceable agreement.

### E. The Implied-Covenant Claim Should Be Dismissed to the Extent It Duplicates the Contract Claim

The implied-covenant claim duplicates the contract claim insofar as it challenges the same alleged nonpayment, the same valuation methodology, and the same alleged attempt to substitute compensation terms. *See Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013). The theories in FAC ¶ 142(i)–(ii) mirror the alleged compensation breaches in ¶ 92(a)–(b); the valuation challenges in ¶ 142(iii) and (vii) overlap ¶ 92(b)(iii); and the objections to replacement terms in ¶ 142(iv) and (viii) overlap ¶ 92(c). Sections 3.1 and 3.3 and Exhibits B and C supply the corresponding express compensation provisions. (FAC Exs. 1–2 §§ 3.1, 3.3 & Exs. B–C.) Recasting those alleged breaches as bad faith does not create an additional cause of action. *See EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co.*, 309 F. Supp. 3d 89, 93 (S.D.N.Y. 2018).

Paragraphs 145–46 separately allege a gap concerning valuation timing and redemption. Section 4.2 governs accrued and vested benefits on termination, while Exhibit C supplies the incentive plan's terms. (FAC Exs. 1–2 § 4.2.) Any valuation or redemption theory must implement those provisions, not create compensation rights contrary to them. Defendants accordingly seek dismissal of Count Seven's duplicative theories identified above, with any distinct timing or implementation theory confined to good-faith performance of a genuine gap in the existing bargain. (FAC ¶¶ 142–47.)

### F. Plaintiffs Fail to State a Labor Law § 740 Claim.

New York Labor Law ("NYLL") § 740 protects qualifying disclosures or threatened disclosures to a supervisor or public body, information or testimony provided to a public body, and objections to or refusals to participate in an employer's activity, policy, or practice that the employee reasonably believes violates a law, rule, or regulation or poses a substantial and specific danger to public health or safety. N.Y. Lab. Law § 740(2)(a)–(c). Plaintiffs must also plausibly allege that the employer took retaliatory action because of protected activity. The statute's definition includes threats and penalization, not only discharge or an alleged reduction in compensation. *Id.* § 740(1)(e).

Plaintiffs identify PSP objections beginning in July 2023, objections to the January 2024 comparison letters, the July 2025 auditor communication and meeting with Pelz and tax counsel, and disclosure and Board-review requests. (FAC ¶ 150.) Paragraph 151 invokes fraud, falsified business records, tax reporting, and financial disclosures. The asserted concerns about misleading communications differ from a demand for contractual payment, but statutory and accounting labels alone do not establish a reasonable belief of illegality without facts connecting the challenged practice to that belief. *See* N.Y. Lab. Law § 740(2). Communications solely to outside auditors or investors do not qualify as disclosures to a statutory supervisor or public body merely because of the recipients' relationship with Prime. *Id.* § 740(1)(d), (f), (2)(a). Even assuming the internal objections and communications with Laag, Pelz, and the Board qualify under § 740(2)(a) or (c), the FAC does not adequately connect them to a timely retaliatory act.

The FAC also must connect an identified retaliatory act to protected activity. Plaintiffs allege disciplinary notices and written warnings "for discussing compensation with colleagues," but do not date those actions or adequately connect them to a disclosure or objection satisfying § 740. (FAC ¶ 152.) Written discipline is not categorically excluded from the statute. Rather, the

missing particulars concerning timing, circumstances, and connection to protected activity prevent a reasonable inference that these alleged actions were taken because Plaintiffs exercised rights protected by § 740. *See Landell v. Life Bridge Dental PLLC*, 236 A.D.3d 520, 521 (1st Dep't 2025) (finding the pleaded allegations insufficient to establish retaliatory material harm or injury).

The FAC alleges objections beginning in July 2023 and objections to the January 2024 comparison letters, alongside compensation conditions imposed in January 2024. (FAC ¶¶ 49–51, 150(iv)–(v).) But paragraphs 49 and 57 describe alleged pressure to accept replacement compensation terms without adequately connecting that pressure to protected objections to any amendments rather than Plaintiffs' refusal to accept the proposed terms or any other protected activity. The overlap between negotiations and objections does not itself establish retaliatory causation. Any discrete retaliatory act before May 28, 2024, also falls outside the two-year limitations period. *See* N.Y. Lab. Law § 740(4)(a). Timely claims must rest on sufficiently pleaded retaliatory acts within that period, although earlier objections may supply relevant context.

Plaintiffs' constructive-discharge theory fails to allege working conditions so intolerable that a reasonable person would have felt compelled to resign. *Landell*, 236 A.D.3d at 521–22. Laag's alleged reference to a "mistake" and statement that "if you have no trust and don't learn from your mistakes . . . I am not sure how we can help or be partners," considered with the alleged discipline and compensation pressure, do not adequately establish an objectively compelled departure. (FAC ¶ 72.) The conditional language, absence of particulars connecting subsequent working conditions to the February 2026 resignation, and Plaintiffs' continued employment for more than nine (9) months after the April 2025 remark undermine that theory. (FAC ¶¶ 11, 72, 78.) Nor does Laag's remark constitute a "threat" within the meaning of the statute. Any separate threat-based claim remains subject to the retaliation and causation deficiencies identified above.

The full alleged chronology, including the alleged 2023 and 2024 objections, 2025 reporting concerns and Board requests, Laag's remarks, asserted discipline, and February 2026 resignation, still lacks sufficient facts connecting a particular timely employment action to protected activity. (FAC ¶¶ 49–51, 57, 72, 150–52.) The undated discipline and generalized pressure do not adequately distinguish retaliation from the underlying compensation negotiations and claimed nonpayment. Temporal proximity supplies no substitute for that connection. *See Caputo v. IESI NY Corp.*, 228 A.D.3d 480, 481 (1st Dep't 2024) (finding a five-month interval without more insufficient at summary judgment). The pleaded circumstances therefore fail to establish causation even assuming protected activity is sufficiently alleged. Accordingly, Plaintiffs' NYLL § 740 claim fails as a matter of law and should be dismissed.

**G. Plaintiffs Fail to State a Fraudulent-Transfer Claim**

Plaintiffs advance the untenable theory that *DRH* violated section 273(a)(1) of New York's Debtor and Creditor Law by engaging in the June 2024 buyback and 2026 Grain transaction to evade *Prime's* purported compensation obligations owed to Plaintiffs.

As an initial matter, Plaintiff fails to allege that the New York Debtor and Creditor Law even applies as the FAC does not allege where the debtor was located when the transfers occurred, let alone that it was in New York. Section 279 selects the local law of the jurisdiction where the debtor was located when the transfer occurred; an organization with multiple places of business is located at its chief executive office. N.Y. Debt. & Cred. Law § 279(a)(3), (b). The FAC identifies Prime's Dallas headquarters and substantial officer activity in New York but does not conclusively establish its chief executive office at either challenged transaction date. (FAC ¶¶ 3, 12, 67, 76.) Without conceding that New York law governs, Defendants seek dismissal on the following alternative grounds under the New York provisions Plaintiffs invoke.

Section 273(a)(1) of New York's Debtor and Creditor Law makes a debtor's transfer or obligation voidable if made or incurred with actual intent to hinder, delay, or defraud a creditor. Section 276 supplies remedies; it does not create a separate actual-intent claim. N.Y. Debt. & Cred. Law §§ 273(a)(1), 276. Actual intent may be inferred from the circumstances, including the nonexclusive considerations or "badges of fraud" outlined in § 273(b). Insolvency is one consideration, not a necessary element of an actual-intent claim, and the creditor's claim may arise before or after the challenged transfer. *Id.* § 273(a)(1), (b). Importantly, "the presence of one or more badges of fraud does not necessarily compel the conclusion that a conveyance is fraudulent." *A&M Glob. Mgmt. Corp. v. Northtown Urology Assocs., P.C.*, 115 A.D.3d 1283, 1288-1289 (4th Dep't 2014).

Even assuming Plaintiffs are creditors of Prime, which they are not, the FAC must identify a transfer of the debtor's property or an obligation it incurred, facts supporting actual intent, and a statutory basis for the relief sought against *DRH*. Indeed, Plaintiffs' fraudulent-transfer theory attacks legitimate corporate transactions without plausibly alleging the required transfer, debtor-creditor relationship, or fraudulent intent.

The compensation obligations at issue are alleged to arise from Plaintiffs' employment agreements with Prime. (FAC ¶¶ 14–24, 159, 161.) While DRH need not separately owe that debt to face liability as a transferee or a person for whose benefit a voidable transfer was made, *see* N.Y. Debt. & Cred. Law § 277(b)(1), alleged common ownership and an asserted economic benefit do not eliminate the need to plead a voidable transaction involving Prime and facts placing DRH within a statutory category of recovery. The 2024 buyback and the 2026 Grain investment must be evaluated separately on those grounds.

For the Grain transaction, Plaintiffs allege that Grain invested $500 million in DRH, which used the proceeds to purchase Prime equity held by an Ares/Macquarie entity and refinance a loan at another Laag-affiliated entity. (FAC ¶¶ 76, 162, 165, 167.) Those allegations identify Grain's payment to DRH and DRH's subsequent uses of the proceeds, but do not adequately identify property of Prime transferred or an obligation Prime incurred. The alleged acquisition of outstanding Prime equity from another holder does not itself identify a disposition of Prime's property. Plaintiff's reliance on allegations regarding alter-ego status in paragraph 166 and their attempt to recast the transaction as "a transfer by Prime" does not cure that omission without facts supporting attribution of the transaction to Prime. *See supra*, Section IV.C.

The June 2024 buyback allegedly involved Prime's payment of approximately $28 million to Macquarie, preserving an equity position from dilution. (FAC ¶¶ 67, 160.) Plaintiffs invoke DRH's alleged benefit under § 277(b)(1)(i), but still must plead Prime's actual intent to hinder, delay, or defraud a creditor. Plaintiffs' anticipated reliance on *Patterson Belknap Webb & Tyler LLP v. Marcus & Cinelli LLP*, 227 A.D.3d 505 (1st Dep't 2024) is misguided and is otherwise completely inapposite. That case involved allegations that attorneys knowingly facilitated a debtor's sale and disposition of property despite an existing judgment and restraining notice. Nothing comparable is alleged here. The asserted ownership benefit and compensation dispute do not transform the repurchase into a creditor-directed transaction or support an inference of intent to hinder creditors. Considering the alleged financing, retained control, transaction timing, and Prime's asserted value together under the statutory factors, the FAC still does not adequately explain how the buyback was undertaken to hinder, delay, or defraud Plaintiffs. *See* N.Y. Debt. & Cred. Law § 273(b); FAC ¶¶ 67, 159–61, 169. Moreover, the buyback occurred in June 2024, long before Plaintiffs' April 2025 letter or February 2026 demand. The only allegation of intent is

conclusory, not factual. (*Id.* ¶ 161.) Accordingly, even assuming New York law applies, the FAC does not adequately plead an actual-intent claim under § 273(a)(1)[2] and a corresponding basis for relief against DRH under §§ 276 and 277.

### H. The Court Lacks Personal Jurisdiction Over DRH

DRH appears solely to contest personal jurisdiction and maintains that objection. Its alternative merits arguments are presented only if the Court finds jurisdiction and does not withdraw or waive the jurisdictional defense. *See* Fed. R. Civ. P. 12(b), (h)(1).

Section 1965(b) requires a properly commenced RICO action against an initial defendant in the forum and circumstances in which the ends of justice require additional parties to be brought before the Court. *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71–72 (2d Cir. 1998). Plaintiffs' assertion that no single district has jurisdiction over all Defendants does not establish every prerequisite for nationwide service or cure the RICO pleading deficiencies. If jurisdiction initially rests on a sufficient federal claim, continued pendent personal jurisdiction after that claim's dismissal remains discretionary. *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 88 (2d Cir. 2018). The Court should decline that jurisdiction if it dismisses all RICO claims at this early stage. Absent authorized nationwide service or retained pendent personal jurisdiction, Plaintiffs must establish an independent basis for jurisdiction over DRH.

Nor do Plaintiffs allege sufficient contacts with New York to establish personal jurisdiction under N.Y. C.P.L.R. 302(a)(1). The Amended Complaint identifies DRH as a Delaware corporation with its principal place of business in California. (FAC ¶ 4.) It identifies Prime, not DRH, as Plaintiffs' employer and contractual counterparty. (FAC ¶¶ 11–14.) The allegations about

[2] Plaintiffs' own allegations that Prime is worth billions (*id.* ¶¶ 73, 83) undercut any plausible inference that the 2024 buyback or 2026 Grain investment impaired Prime's ability to pay its creditors or that the transactions were undertaken to hinder, delay, or defraud Plaintiffs or any other purported creditor.

the Grain transaction and DRH's equity holdings do not adequately identify New York business transacted by DRH from which Plaintiffs' claims arise. (FAC ¶¶ 76, 129, 162.) The Employment Agreements' references to "Company Affiliates" do not, without allegations identifying DRH's relevant conduct, establish that nexus. (ECF No. 26 at 5; FAC ¶ 128.)

Jurisdictional alter ego imposes a less onerous standard than substantive veil-piercing liability. *JoySuds, LLC v. Awesome Products, Inc.*, No. 25 Civ. 2977 (DEH), 2026 U.S. Dist. LEXIS 30584, at *6 (S.D.N.Y. Feb. 13, 2026). Applying that standard, the FAC alleges common decision-makers, no independent staff or infrastructure, undercapitalization, and commingling. (FAC ¶ 87.) But its generalized commingling assertion identifies no funds, accounts, or transactions demonstrating disregard of separateness. Allegations that a holding company has limited staffing and benefits from appreciated equity do not alone demonstrate domination sufficient to attribute Prime's New York contacts to DRH. The financing allegations likewise do not identify the factual connection necessary for that attribution. (FAC ¶¶ 76, 87–88, 162, 165.) Considered together and with reasonable inferences favoring Plaintiffs, these allegations do not sufficiently establish jurisdiction over DRH. A contrary prima facie jurisdictional determination would not resolve substantive alter-ego liability.

## I. Further Leave to Amend Should Be Denied Where No Viable Cure Is Identified

Leave to amend should be freely given when justice requires, but may be denied for futility, repeated failure to cure identified deficiencies, or another adequately supported reason. Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178, 182 (1962). Plaintiffs were ordered by the Court to amend their initial complaint for failure to comply with Fed. Rule. Civ. Proc. Rule 8. While the FAC eliminated some of the unnecessary rhetoric, it still fails to plead facts which establish viable legal claims. Defendants identified dismissal grounds in the original pre-motion letter, Plaintiffs amended following the Court's Rule 8 direction, and Defendants renewed their objections to the

FAC. (ECF Nos. 16, 22, 24–25.) Plaintiffs then stated that they “do not seek leave to amend the FAC,” while reserving the right to request leave after reviewing the motion. (ECF No. 26 at 1.) The prior amendment and Plaintiffs’ decision not to request another are relevant procedural circumstances, not an automatic forfeiture of the opportunity to propose a viable claim, but they weigh heavily against further leave or, at a minimum, support requiring that any renewed request specifically identify proposed cures.

Furthermore, leave to amend may be denied as futile where the defect is substantive. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (“[T]he problem with [plaintiff’s] causes of action is substantive; better pleading will not cure it. . . . Such a futile request to replead should be denied.”). Accordingly, Defendants request denial of further leave to the extent amendment would be futile.

## V. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court (i) dismiss all claims against DRH without prejudice for lack of personal jurisdiction, including by declining any discretionary pendent personal jurisdiction; (ii) dismiss the Second through Tenth Causes of Action against the remaining Defendants to the extent and on the grounds set forth above, and, only if the Court finds jurisdiction over DRH, grant the corresponding alternative merits relief as to DRH; (iii) dismiss with prejudice claims for which amendment would be futile, while limiting any leave to a specifically identified viable cure; and (iv) grant such other and further relief as the Court deems just and proper. The requested dismissal of the quasi-contract and implied-covenant claims is subject to the alternative-pleading limitations addressed in Sections IV.D–E. Defendants do not seek dismissal of the First Cause of Action against Prime on this motion.

Dated: November 6, 2026
New York, New York

LITTLER MENDELSON, P.C.

*/s/ William J. Anthony*

William J. Anthony
Jamie Haar
James F. Bryton
900 Third Avenue
New York, New York 10022-3298
212.583.9600
WAnthony@littler.com
JHaar@littler.com
JBryton@littler.com

*Attorneys for Prime Data Centers, LLC, Nicholas Laag, and Ulrich Pelz, and for Data Realty Holdings Corp. for the limited purpose of contesting personal jurisdiction*

CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), I certify that this memorandum contains 8,173 words, excluding the caption, any index, tables of contents and authorities, signature blocks, and required certificates, and including footnotes and endnotes. Based on that count, the memorandum complies with the applicable word limit. In preparing this certificate, I relied on the word count of the word-processing program used to prepare the memorandum.

Dated: November 6, 2026
New York, New York

*/s/ William J. Anthony*
William J. Anthony